Wendee LONG, Appellant

v.

The STATE of Texas

NO. PD-0984-15

Court of Criminal Appeals of Texas.

Filed: June 28, 2017

ATTORNEYS FOR APPELLANT: Bruce Anton, Sorrels, Udashen & Anton, Dallas, TX.

ATTORNEYS FOR THE STATE: John R. Messinger, Assistant State Prosecuting Attorney, Stacey Soule, Austin, TX.

## OPINION

Newell, J. delivered the opinion of the Court in which Keller, P.J., Keasler, Hervey, Yeary, and Keel, JJ. joined.

Does the definition of "oral communication" in the state wiretap statute incorporate the expectation-of-privacy test? We hold that it does. Under this standard, does a high school basketball coach have an expectation of privacy in his team's locker room during halftime? We hold that under the circumstances presented in this case, he does. Consequently, we affirm Appellant's conviction for her role in the interception of the coach's communication with his team in the team's locker room.[1]

### I. The Conduct

There is relatively little disagreement on what happened. At the time of the offense, Wendee Long was the principal of Wayside Middle School in Saginaw, Texas and a member of the Argyle I.S.D. school

---

1. *Long v. State*, 469 S.W.3d 304 (Tex. App.— El Paso 2015).

board. Long's daughter, C.L., attended Argyle High School and traveled to Sanger High School to attend a girls' high-school basketball game between the two rivals. It was the last game of the season, and the Argyle team was one game behind the Sanger team in the standings.

Shortly before halftime, C.L. went to sit with a friend of hers, P.S., who also happened to be a student at Sanger High School. C.L. claimed to be a "team manager" for the Argyle girls' basketball team, and asked her friend for help getting into the visitor's locker room. P.S. knew that team managers for visiting teams would be allowed into the visitor's locker room, so she agreed to show C.L. where the visitor's locker room was located.

All teams that visit another school for an athletic event are assigned a visitor's locker room. In this case, the visitor's locker room was at the end of a hall of three locker rooms. One must pass through two sets of doors to enter the locker room. The first set of doors leads to a little "nothing" room and the second set opened into the locker room itself. The room consisted of a changing area in front of lockers and a separate area for showers and toilets.

The girls' basketball coach, Lelon "Skip" Townsend, described the locker room as a private area to get away from the people that are at the ball game and allow the coaches and teammates to meet and discuss aspects of the game or do team activities such as pray. It was Coach Townsend's understanding that no one was supposed to be able to access the locker room except the Argyle team and the coaches. Team members could use the locker room to store their belongings and get dressed, though no male coaches were allowed in while the female players were dressing. Coach Townsend acknowledged that "sometimes" a locker room could be thought of as a sports classroom, but no

one disputed that the access to the locker room was limited to Argyle team members and the coaches.

On the way to the locker room, C.L. informed her friend that she was going to set up her phone in the locker room to record Coach Townsend's halftime speech. After C.L. entered the locker room, she set her phone inside the door to one of the small lockers and taped the phone so it would not fall once the locker was shut. From that position, the phone made an audio and visual recording of the coach's halftime speech.

After halftime was over, C.L. and P.S. returned to the locker room to retrieve the phone. C.L. showed the recording to another friend of hers and asked that friend for help in cropping the video. Unfortunately, C.L. deleted some of the recording while trying to crop it, so she returned to the locker room to make another recording. She was able to obtain additional audio of the coach speaking to the basketball team after the game, but not additional video because the camera fell down after the locker was closed. The video portion of the first recording reveals that Coach Townsend gave his halftime speech in the changing area of the girls' locker room. However, the girls were not changing clothes at the time.

A copy of both recordings spliced together was emailed to all the members of the school board in advance of the school board taking up the issue of whether to award Coach Townsend a term contract. Notably, some audio on the recording emailed to the school board members was edited in such a manner that particular statements made by Coach Townsend during his speeches were copied and then repeated at the end of the recording. None of the girls on the team were aware they were being recorded, and Coach Townsend

did not give anyone permission to record his remarks to his team.

At some point, Long showed one of her assistant principals a part of the video. Long also told that assistant principal that her husband was angry because he believed Long was allowing C.L. "to take the fall" for the recording. The superintendent for the school district eventually delivered a copy of the recording to the police.

A detective with the Sanger Police Department requested the cell phones for Long's two daughters. Long's husband provided C.L.'s phone, but it was a brand new phone. When police requested the phone that C.L. had been using around the time of the taping, they discovered that the screen had been shattered. They were also unable to get access to the hard drive on Long's personal computer because it had been replaced.

However, the police did get access to Long's work computer. On that computer, they found a copy of the recording turned over to the police by the superintendent. Long's computer also contained an additional, longer copy of the recording that had additional footage. This footage included a video recording of Long's daughter returning to the locker room to retrieve the phone after the halftime speech. The footage of Long's daughter was not included on the copy of the video that was distributed to the school board.

Long also provided to police an unsigned, typed statement attempting to explain the chain of events. According to Long, "the journey to this bad decision" started a year before the incident. The original girls' basketball coach was pulled from the "approval list" shortly before his contract was up for renewal, and Long was unsure as to why. When a special board meeting was called to hire both Coach Townsend and his wife, Long became concerned because she was unaware of any other position opening other than the coach position and she had done her own research into the contacts provided by the Townsends. Long was unable to attend the special board meeting and, according to Long, the Townsends were hired with just enough votes.

Long spent the bulk of her written statement detailing complaints against Coach Townsend. According to Long, numerous parents approached her to complain that Coach Townsend was too mean, and that neither the principal nor the school's athletic director would do anything to remedy the situation. Paradoxically, Long also explained that several of these parents were AISD employees who had come forward to complain to her that they were afraid to come forward generally due to fear that they might lose their jobs. Out of the five-page, single-spaced, typed statement, Long devoted only four paragraphs to details about the recording.

According to Long, the recording was her daughter's idea. Long related that her daughter had initially tried to get a recording of Coach Townsend during a game between Argyle and Gainesville because "someone has to let people see how he acts to them." However, C.L. informed Long that she was unable to get the recording because policemen were there. According to Long, C.L. called her after the Argyle-Sanger game to say that she had gotten the recording by taping the phone to a locker and placing it on airplane mode so that there were no interruptions.

Finally, Long added that in March, before the board meeting to discuss Coach Townsend's contract, she happened upon the video on her personal computer, claiming it had been downloaded by C.L. Upon seeing the recording, Long claimed to have wondered whether the school board would understand "a little of what is trying to be

explained" if they were to see Coach Townsend in action. However, she denied that the video was ever made to catch the girls on the team dressing or undressing, stating that it was only made "in the hopes of the leadership of the district being able to see Coach Townsend's treatment of 15-18 year old girls." Long concedes that she sent the recordings to the school board.

## II. The Charges

The State charged Long with the unlawful interception of oral communication, or electronic eavesdropping, alleging in two paragraphs that she had violated Section 16.02 of the Texas Penal Code. Section 16.02(b)(1) makes it a crime when a person "intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication[.]" [2] Section 16.02(b)(2) provides that a person commits a crime when that person "intentionally discloses or endeavors to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violation of [subsection (b) ]." [3]

Section 16.02 does not define many of the terms of the offense; rather, it specifically incorporates the definitions found in Article 18.20 of the Texas Code of Criminal Procedure.[4] Under Article 18.20, "oral communication" means "an oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation." [5] "Intercept" means "the aural or other acquisition of the contents of a wire, oral, or electronic communication through the use of an electronic, mechanical, or other device." [6] "Contents" when used with respect to a wire, oral, or electronic communication, "includes any information concerning the substance, purport, or meaning of that communication." [7]

There are a number of affirmative defenses in Section 16.02 as well. Specifically, a party to the communication has an affirmative defense to the interception of the oral communication.[8] And, someone who intercepts an oral communication has an affirmative defense if one of the parties to the communication has given prior consent to the interception, unless the communication is intercepted for the purpose of committing an unlawful act.[9] We have also held that a parent may vicariously consent on behalf of his or her child to a recording of the child's conversations so long as the parent has an objectively reasonable, good-faith basis for believing that recording the conversations is in the child's best interest.[10]

In one paragraph of the indictment in this case, the State alleged that Long violated Section 16.02 by encouraging C.L. to record Townsend's speeches. In the other paragraph, the State alleged that Long violated Section 16.02 when she showed

2. TEX. PENAL CODE § 16.02(b)(1).

3. TEX. PENAL CODE § 16.02(b)(2).

4. TEX. PENAL CODE § 16.02(a).

5. TEX. CODE CRIM. PROC. art. 18.20, § 1(2).

6. TEX. CODE CRIM. PROC. art. 18.20, § 1(3).

7. TEX. CODE CRIM. PROC. art. 18.20, § 1(6).

8. TEX. PENAL CODE § 16.02(c)(4)(A).

9. TEX. PENAL CODE § 16.02(c)(4)(B).

10. *Alameda v. State*, 235 S.W.3d 218, 223 (Tex. Crim. App. 2007).

C.L.'s illegal recording to Long's assistant principal.[11] The jury found Long guilty.[12]

### III. The Appeal

At trial and on appeal, Long argued that, as a matter of law, she had committed no crime because Townsend had no reasonable expectation of privacy in his locker-room speeches to his team.[13] The court of appeals agreed. The court of appeals acknowledged that "[i]t is widely accepted that a public school teacher has no reasonable expectation of privacy in a classroom setting."[14] The court of appeals then detailed several cases holding that a teacher has no expectation of privacy in their public classroom.[15] The court of appeals then characterized a public high school coach as an "educator," noting that some of the duties of a coach involve a type of teaching.[16] From there, the court of appeals extrapolated that no public school educator, whether a teacher or a coach, has a reasonable expectation of privacy in his or her "institutional communications and activities, regardless of where they occur, because they are always subject to public dissemination and generally exposed to the public view."[17] Thus, the court of

appeals held that Coach Townsend's speeches did not constitute "oral communication" under the statute because he was "teaching" in the visitor's locker room.[18]

The State Prosecuting Attorney's Office argues on discretionary review that the plain language of Section 16.02 prohibits people who are not parties to a private conversation from surreptitiously recording that conversation and disseminating that recording. According to the SPA, the statutory definition of "oral communication" is plain and prohibits a person who is not a party to a conversation from recording that conversation without the knowledge and consent of the parties, provided the recorded parties exhibited a justified expectation that they would not be recorded. Finally, the SPA argues that the statute defines "oral communication" based on what is captured rather than what is communicated, and therefore it does not matter whether Coach Townsend was speaking as an educator when he spoke to his team. Based upon this understanding of the statute, the SPA argues that the court of appeals erred by determining as a matter of law that Long had not intercepted or disclosed "oral communications."

11. The State chose to treat subsections (b)(1) and (b)(2) as different manner and means of one offense, resulting in a single conviction for electronic eavesdropping. We take no position on whether the State was correct in doing so.

12. The State also charged Long with, and tried Long for, a violation of Section 21.15(b) of the Texas Penal Code, the improper photography or visual recording statute, in a separate count. TEX. PENAL CODE § 21.15(b). However, the jury found Long not guilty on that charge. This Court subsequently held that the improper photography or visual recording statute was facially unconstitutional. *Ex parte Thompson*, 442 S.W.3d 325, 351 (Tex. Crim. App. 2014).

13. Long challenged the sufficiency of the evidence at trial through a motion for directed verdict, a motion for judgment of acquittal,

and a motion for new trial. On appeal, she challenged the trial court's denial of these motions as well as the sufficiency of the evidence. Long acknowledged, however, that each of these arguments were based upon the same legal theory that the complainant did not have a reasonable expectation of privacy in his locker-room speeches to his players.

14. *Long v. State*, 469 S.W.3d 304, 308 (Tex. App.—El Paso 2015).

15. *Id.* at 309.

16. *Id.* at 310.

17. *Id.* at 311.

18. *Id.* at 313.

## IV. Analysis

In reviewing the sufficiency of the evidence to support a conviction, we typically look to whether any rational finder of fact could have found the essential elements of the offense beyond a reasonable doubt.[19] We view the evidence in a light most favorable to the prosecution by resolving any factual disputes in favor of the verdict and deferring to the fact-finder regarding the weighing of evidence and the inferences drawn from basic facts.[20] In some cases, however, a sufficiency-of-the-evidence issue turns upon the meaning of the statute under which the defendant is being prosecuted.[21] We ask if certain conduct actually constitutes an offense under the statute.[22] As with all statutory construction questions, this type of analysis answers a question of law.[23] We review questions of law *de novo*.[24]

Here, the parties ask us to determine whether Article 18.20 requires a determination that Coach Townsend had a "legitimate expectation of privacy."[25] Ordinarily, the determination of whether a legitimate expectation of privacy exists is litigated in the context of a motion to suppress rather than as an element of an offense. In the motion to suppress context, the issue of whether a legitimate expectation of privacy exists—whether a defendant has "standing" to contest a search—is determined by a trial court after consideration of the "totality of the circumstances surrounding the search."[26] When reviewing the trial court's ruling on a motion to suppress, we defer to the trial court's factual findings and view them in a light most favorable to the prevailing party, but we review the legal issue of standing *de novo*.[27]

In the context of this case, if we are to make a legal determination of whether a legitimate expectation of privacy exists, we have to rely upon the jury's verdict. For determinations of historical fact, we apply the traditional standard of review for legal sufficiency to determine what the totality of the circumstances are, deferring to the jury's rational factual determinations and inferences.[28] Then, we evaluate *de novo* the purely legal question of whether a legitimate expectation of privacy exists.[29]

Viewing the evidence in the light most favorable to the jury's verdict, a rational jury could have concluded that Long wanted to affect the school board's renewal of Coach Townsend's contract so she encouraged her daughter to sneak into the girls'

---

19. *Liverman v. State*, 470 S.W.3d 831, 835-36 (Tex. Crim. App. 2015).

20. *Id.* at 836; *see also Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

21. *Liverman*, 470 S.W.3d at 836.

22. *Id.*

23. *Id.*

24. *Harris v. State*, 359 S.W.3d 625, 629 (Tex. Crim. App. 2011).

25. *See State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) (explaining that demonstrating a "legitimate expectation of privacy" requires a showing of a subjective expec-

tation of privacy that society is prepared to regard as objectively reasonable).

26. *Ex parte Moore*, 395 S.W.3d 152, 159 (Tex. Crim. App. 2013).

27. *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004).

28. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Moore*, 395 S.W.3d at 159.

29. *Liverman*, 470 S.W.3d at 836; *Kothe*, 152 S.W.3d at 59.

locker room and record Coach Townsend's communication to the team. The locker room itself was not open to the general public with access restricted to Argyle coaches and team members. It was designed with two sets of entry doors to provide a place for young girls to dress and keep personal items. C.L. had to pretend to be an Argyle team manager in order to gain access to the locker room.

C.L. snuck into the locker room immediately before halftime and taped her cell phone to the inside of the locker to make a video recording of Coach Townsend's halftime speech. Coach Townsend believed the girls' locker room was private when he entered it and spoke to his team. The room itself had a changing area in front of the lockers with a separate bathroom area. Coach Townsend's speech took place in the changing area but none of the girls were changing at that time. C.L.'s phone made an audiovisual recording of Coach Townsend's halftime speech. While one of the three coaches present held the inner-door to the locker room partially open in preparation for the team to go back to the gym, nothing in the record indicates that the outer door was open. Neither Coach Townsend, nor the members of the basketball team gave consent to the recording. No one disputed that the locker room itself was closed to unauthorized personnel such as C.L.

Shortly after halftime was over, C.L. retrieved the phone from the locker. She later went back and placed the phone into a locker and recorded Coach Townsend's after-game speech. She provided copies of the recordings to her mother who then edited them to combine the two recordings, exclude any footage of her daughter, and repeat certain statements made by Coach Townsend. Long distributed the edited video anonymously to the members of the school board.

With these circumstances in mind, we turn to the two legal questions in this case. First, we consider whether the Article 18.20 definition of "oral communication" incorporates the "legitimate expectation of privacy" standard. That is, we ask if the State was required to prove that Coach Townsend had a subjective expectation of privacy that society is prepared to regard as objectively reasonable in order to convict Long of violating Section 16.02.[30] We conclude that the State was. Second, we consider whether the State satisfied that standard. That is, we ask whether the State actually proved that Coach Townsend's speech was "oral communication." To answer that, we consider whether Coach Townsend harbored a subjective expectation of privacy that society is prepared to regard as objectively reasonable. We conclude that he did.

## A. The Definition of "Oral Communication" in Article 18.20 Incorporates the Legitimate Expectation of Privacy Standard

When we interpret statutes, our constitutional duty is to determine and give effect to the collective intent or purpose of the legislators who enacted the legislation.[31] We necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of the text at the time of its enactment.[32] If the plain language is

---

30. *See, e.g., Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) (setting out the "legitimate expectation of privacy" standard as requiring a showing of a subjective expectation of privacy that society regards as objectively reasonable).

31. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

32. *State v. Cooper*, 420 S.W.3d 829, 831 (Tex. Crim. App. 2013).

clear and unambiguous, our analysis ends because "'the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute.'"[33] If the statutory language is ambiguous or leads to absurd results, we can consider extra-textual sources.[34] Ambiguity exists when reasonably well-informed persons may understand the statutory language in two or more different senses.[35]

▮ The statutory language at issue is the definition of "oral communication" found in Article 18.20, sec. 1(2) of the Code of Criminal Procedure.

> (2) "Oral communication" means an oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation. This term does not include an electronic communication.[36]

The court of appeals framed the legal issue in this case as "whether Townsend had a reasonable expectation of privacy in his speeches."[37] The State argues that, as a matter of statutory construction, the Texas Legislature did not incorporate the Fourth Amendment's "legitimate expectation of privacy" standard into the Texas criminal wiretap statute. According to the State, the definition of "oral communication" set out in Article 18.20 only includes communication that someone utters when he or she reasonably believes someone is not recording it. And while the State agrees that the phrase "circumstances justifying that expectation" necessarily incorporates a reasonableness standard, the State does not agree that the phrase "circumstances justifying that expectation" refers to an expectation of privacy. In essence, the State argues that the statute incorporates an expectation-of-non-interception standard rather than the expectation-of-privacy standard used by the court of appeals.

Appellant responds that the phrase "circumstances justifying that expectation" is ambiguous and does not make sense without reference to a reasonable expectation of privacy. Appellant points to cases where we have held that undefined terms such as "materiality" and "voluntarily" are ambiguous because they are susceptible to different meanings.[38] According to Appellant, the phrase "circumstances justifying that expectation" is so dependent upon context that it is ambiguous.

Notably, this Court seems to have recognized that the statute is at least reasonably susceptible to Appellant's interpretation. We applied the expectation-of-privacy standard when construing the wiretap statute in *State v. Scheineman.*[39] There, police placed two arrestees together in a room at a county law enforcement building while both were in custody, and unbeknownst to the arrestees, the police sur-

---

**33.** *Nguyen v. State*, 359 S.W.3d 636, 642 (Tex. Crim. App. 2012) (quoting *Boykin*, 818 S.W.2d at 785).

**34.** *Ex parte Perry*, 483 S.W.3d 884, 903 (Tex. Crim. App. 2016).

**35.** *Bryant v. State*, 391 S.W.3d 86, 92 (Tex. Crim. App. 2012).

**36.** Tex. Code Crim. Proc. art. 18.20, § 1(1).

**37.** *Long*, 469 S.W.3d at 307.

**38.** *See, e.g., Keeter v. State*, 74 S.W.3d 31, 36 (Tex. Crim. App. 2002) (holding that the undefined term "material" in Article 40.001 of the Code of Criminal Procedure was ambiguous because the standard for "materiality" varies according to context); *Brown v. State*, 98 S.W.3d 180, 183 (Tex. Crim. App. 2003) (holding that the undefined term "voluntarily" in section 20.04(d) of the Penal Code is ambiguous because it is susceptible to different meanings).

**39.** 77 S.W.3d 810 (Tex. Crim. App. 2002).

reptitiously recorded the conversation between the two men.[40] When the State sought to use the recording against one of the parties to the conversation, the defendant filed a motion to suppress claiming the recording was obtained in violation of the state wiretap statute as well as his constitutional rights.[41] The trial court granted the motion to suppress, but we subsequently reversed.[42] We noted that the "dispositive issue" in the case was whether society would regard the defendant's expectation of privacy in a room in a law enforcement building as reasonable.[43] We held it would not.

> We do not believe that society is prepared to recognize a legitimate expectation of privacy in conversations between arrestees who are in custody in a county law enforcement building, even when only the arrestees are present and they subjectively believe that they are unobserved. Having found no legitimate expectation of privacy in such conversations, we hold that the excluded statements were admissible.[44]

Though the State never challenged the applicability of the expectation-of-privacy-standard in *Scheineman*, our reliance upon that standard in our analysis suggests that "reasonably well-informed" people could interpret the statute in this way.

Texas courts of appeals have also interpreted the state wire tap statute to incorporate an expectation-of-privacy analysis.[45] And the State acknowledges that there are a number of cases interpreting the almost identical definition of "oral communication" in the Federal Wire tap Statute that support Appellant's position.[46]

Thus, there appear to be at least two possible interpretations for the phrase "circumstances justifying that expecta-

40. *Id.* at 811.

41. *Id.*

42. *Id.* at 813.

43. *Id.*

44. *Id.*

45. *Meyer v. State*, 78 S.W.3d 505, 508-09 (Tex. App.—Austin 2002, pet. ref'd) (holding that the interception of a defendant's statements in the back of a patrol car did not violate federal or state wiretapping statutes because the defendant lacked a reasonable expectation of privacy); *Ex parte Graves*, 853 S.W.2d 701, 705 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (interpreting the definition of "oral communication" to include an expectation of privacy); *see also Moseley v. State*, 223 S.W.3d 593, 599 (Tex. App.—Amarillo 2007) (holding that statements made during phone call while in custody were not "oral communication" because defendant had no expectation of privacy so statements were not made under circumstances that justified an expectation that the communication would not be intercepted), *aff'd*, 252 S.W.3d 398 (Tex. Crim. App. 2008).

46. *United States v. Peoples*, 250 F.3d 630, 637 (8th Cir. 2001) ("Before the interception of a conversation can be found to constitute a search under the Fourth Amendment or an 'oral communication' under the federal wiretap law . . . the individuals involved must show that they had a reasonable expectation of privacy in that conversation."); *United States v. Clark*, 22 F.3d 799, 801 (8th Cir. 1994) ("Under either the fourth amendment or the Wiretap Act, the inquiry is 1) whether the defendant manifested a subjective expectation of privacy, and 2) if so, whether society is prepared to recognize that expectation as reasonable."); *United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. 1993) ("the statutory and constitutional test is whether a reasonable or justifiable expectation of privacy exists"); *In re John Doe Trader Number One*, 894 F.2d 240, 242 (7th Cir. 1990) ("Congress limited its protection of 'oral communications' under Title III to those statements made where 'first, a person [has] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." ' ").

tion." On the one hand, the phrase could, as the State argues, merely require a showing of a reasonable expectation that the communication at issue was not being recorded. But on the other hand, the phrase could, as Appellant argues, include within it a requirement that there be a showing of an expectation of privacy. Because reasonably well-informed people may understand the statute in two or more different ways, we agree with Appellant that the statute is at least ambiguous in this regard.[47] Consequently, we resort to extra-textual sources to attempt to give effect to the legislature's intent.

Resort to extra-textual sources supports Appellant's argument that the legislature intended the definition of "oral communications" to incorporate the expectation-of-privacy standard.[48] Article 18.20 of the Code of Criminal Procedure was passed in 1981 by the 67th Texas Legislature as part of House Bill 360. According to the Bill Analysis from the House Criminal Jurisprudence Committee, the Texas Legislature passed Article 18.20 of the Code of Criminal Procedure (and Section 16.02 of the Penal Code) in response to the passage of Title III of the Omnibus Crime Control and Safe Streets Act by the U.S. Congress.[49]

The Bill Analysis does recite that Congress, when enacting the federal wiretap statute, "intended to permit state electronic surveillance laws to be more restrictive than the Federal Act, and therefore more protective of individual privacy, but state enactments cannot be less restrictive." [50] Our State legislature did not take the federal government up on that invitation when it came to the definition of "oral communication." According to the Bill Analysis, "The bill generally follows the provisions of Title III except for provisions which limit the use of electronic surveillance to narcotics cases, provisions for the designation of a judge from each administrative judicial district to rule on applications, provisions relating to applying authorities and provisions defining the role of the Texas Department of Public Safety as the only agency in implementing any electronic surveillance." [51] Our legislature adopted essentially the same definition of "oral communication" used in the federal wiretap statute despite acknowledging the authority and ability to draft a more restrictive definition.[52] This supports the con-

47. *See, e.g., Ex parte White*, 400 S.W.3d 92, 93-94 (Tex. Crim. App. 2013) (setting out two possible interpretations of the term "arrest" as used in section 508.253 of the Texas Government Code before determining the statute to be ambiguous).

48. *See, e.g., State v. Schunior*, 506 S.W.3d 29, 34-35 (Tex. Crim. App. 2016) (noting that a statute is ambiguous when it may be understood by reasonably well-informed persons in two or more different senses).

49. House Comm. on Crim. Juris., Bill Analysis, Tex. H.B. 360, 67th Leg. R.S. (1981); *see also Castillo v. State*, 810 S.W.2d 180, 182-83 (Tex. Crim. App. 1990) ("Title III regulates the electronic and mechanical interception of wire, oral, and electronic communications by government officials and private citizens.").

50. *Id.* at 1.

51. *Id.*

52. *Compare* 18 U.S.C. § 2510(2)(West 2016) ("Oral communication" means "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such an expectation, but such term does not include any electronic communication.") *with* Tex. Code Crim. Proc. art. 18.20 § 1(2) ("Oral communication" means "an oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation. This term does not include an electronic communication.").

clusion that our legislature intended the definition of "oral communication" be read consistently with the almost identical definition of "oral communication" in the federal wiretap statute.[53]

The legislative history behind the federal wiretap statute reveals that Congress' intent was to protect people engaged in oral communications under circumstances justifying their expectation of privacy.[54] As both the State and Appellant observe, the purpose of Title III was creating legislation to meet the constitutional standard set out by the United States Supreme Court in *Berger v. New York* and *Katz v. United States*.[55] This supports the conclusion that the definition of "oral communication" was meant to incorporate the expectation-of-privacy standard.

Moreover, the State relies upon cases that actually apply the expectation-of-privacy standard when analyzing the definition of "oral communication" in the federal wiretap statute. *Boddie v. American Broadcasting Companies, Inc.*, for example, held that a woman who voluntarily spoke with reporters may have retained an expectation of privacy in that conversation when the reporters surreptitiously recorded a portion of it without the woman's consent.[56] *Huff v. Spaw* held that a woman had an expectation of privacy in a conversation with her husband even though, unbeknownst to her, her husband's cell phone had pocket-dialed a third person.[57] While these cases do note the interplay between an expectation of privacy and the terms of the federal wiretap statute, the results are nonetheless couched in terms of an expectation of privacy. These cases certainly do not reject an expectation-of-privacy analysis; they simply address nuances contained within that standard.

We have found two cases that interpreted the federal wiretap statute consistent with an expectation-of-non-interception standard.[58] But the federal circuit courts that decided those cases have more recently eschewed that standard in favor of a traditional expectation-of-privacy analysis.[59] There no longer appear to be any courts incorporating an expectation-of-non-interception standard into the federal definition of "oral communication." Though a person's reasonable expectation that his statements will not be intercepted will necessarily inform an expectation-of-privacy analysis and vice versa, interpreting the state wiretap statute to incorporate the expectation-of-privacy test is consistent with the legislative intent behind the promulgation of the state and federal wiretap statutes.

We agree with the court of appeals that our legislature intended that the definition of "oral communication" in Article 18.20 be read to incorporate the Fourth Amend-

---

53. *See also Castillo*, 810 S.W.2d at 183 (noting that the Court should consider the statutory construction of the federal wiretap statute by other courts because the definition of "intercept" in Article 18.20 was borrowed from the federal wiretap statute).

54. S. Rep. No. 90-1097 at —— (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2178; *see also Ex parte Graves*, 853 S.W.2d at 705 (citing *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978)).

55. State's Br. 18; Appellant's Br. 25-26; *see also* 1968 U.S.C.C.A.N. 2112, 2113.

56. 731 F.2d 333, 338-39 (6th Cir. 1984).

57. 794 F.3d 543, 554 (6th Cir. 2015).

58. *See, e.g., Angel v. Williams*, 12 F.3d 786, 789-90 (8th Cir. 1993); *Walker v. Darby*, 911 F.2d 1573, 1579 (11th Cir. 1990).

59. *See, e.g., United States v. Peoples*, 250 F.3d 630, 636-37 (8th Cir. 2001); *United States v. McKinnon*, 985 F.2d 525, 526 (11th Cir. 1993).

ment's legitimate-expectation-of-privacy standard. To that end, when determining whether a person exhibited "an expectation that the communication is not subject to interception" under Article 18.20, we ask whether the person speaking displayed through his conduct a subjective expectation of privacy in his conversation. When we consider whether there were "circumstances justifying that expectation" under Article 18.20, we must determine whether society is prepared to recognize a person's subjective expectation of privacy as objectively reasonable. We turn now to the question of whether Coach Townsend's locker-room speech constituted "oral communication" under the statute.

## B. Coach Townsend's Speech Was "Oral Communication"

█ There does not appear to be serious dispute that Coach Townsend harbored "an expectation that his communication was not subject to interception."[60] He testified that he believed that the locker room was private. As noted above no one was allowed to access the locker room except the Argyle team and the coaches. Upon learning that his communication with his team had been recorded, Coach Townsend felt that his privacy had been violated. We hold that a rational jury could have

found that Coach Townsend harbored a subjective expectation of privacy.[61] The remaining question then is whether Coach Townsend's subjective expectation of privacy was one that society is prepared to regard as objectively reasonable. We hold that it is.

### 1. *Berger v. New York* and *Katz v. United States*

Eavesdropping is an ancient practice which at common law was condemned as a nuisance.[62] At one time the eavesdropper listened by naked ear under the eaves of a house or at its windows or beyond its walls seeking out private discourse.[63] In 1967, when the United States Supreme Court decided *Berger*, the Court recognized that technological advances had yielded sophisticated electronic devices capable of eavesdropping under almost any condition by remote control.[64] At that time, the Court was concerned with devices suitable to an Ian Fleming novel such as miniature microphones (no bigger than a postage stamp) and "electric rays" beamed at walls or glass windows to record voice vibrations.[65] Doubtless the Court could not even imagine the eavesdropping potential in the modern cell phone.[66]

*Berger* was the go-between for the principal co-conspirators in a conspiracy to

---

**60.** Long does argue that Coach Townsend did not actually exhibit a subjective expectation of privacy because there was evidence that he was not allowed in the locker room while the girls were dressing and that on some occasions (not necessarily this one) he could be overheard from outside the locker room. At most, this evidence presented a conflict the jury was free to resolve against Long. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) ("[W]hen the record supports conflicting inferences, we presume that the jury resolved conflicts in favor of the verdict, and we defer to that determination.").

**61.** *Betts*, 397 S.W.3d at 204 (holding defendant had expectation of privacy in his aunt's backyard based upon permission from his

aunt to keep his dogs in the back yard and enter the premises to water and feed them).

**62.** *Berger v. New York*, 388 U.S. 41, 45, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

**63.** *Id.*

**64.** *Id.* at 47, 87 S.Ct. 1873.

**65.** *Id.*

**66.** *See, e.g., Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2489-90, 189 L.Ed.2d 430 (2014) (describing in detail the multitude of features of modern cell phones as well as noting their pervasiveness in modern society).

bribe the Chairman of the New York State Liquor Authority.[67] Police obtained two different ex parte orders under the New York "eavesdropping" statute to plant listening devices in the offices of the attorneys for Berger and his co-conspirators.[68] After some two weeks of eavesdropping, evidence of the conspiracy was uncovered, and New York charged Berger based solely upon his conversations with the attorneys in their respective offices.[69]

The Supreme Court struck down the New York statute because it effectively authorized a "general warrant" for the collection of evidence after a trespassory invasion of a home or office.[70] Though the statute required police to obtain an order from a neutral and detached magistrate before placing the listening device, it did not explicitly require a showing of probable cause, only a showing of a "reasonable ground."[71] And, even assuming that a showing of "reasonable ground" equaled a showing of probable cause, it also failed to require a showing of particularity as to the crime under investigation, the place to be searched, or the person or things to be seized.[72] This need for particularity was especially great in the context of eavesdropping because of its intrusion upon privacy.[73] According to the Court, the New York Statute authorized "indiscriminate use" of an electronic listening device.[74]

Several months later, the Court decided *Katz v. United States.*[75] The United States charged Katz with taking bets in a public telephone booth in Los Angeles from gamblers in Miami and Boston.[76] FBI agents obtained key evidence in the case by attaching an electronic listening and recording device to the outside of the booth and recording Katz's end of the conversation.[77] At trial, the prosecution introduced these recordings, over objection, based upon the theory that the recording did not violate the Fourth Amendment because the agents had not physically intruded into the public telephone booth occupied by Katz.[78]

The Court reversed, holding that the recording of Katz's side of the conversation, even overheard from outside a public telephone booth, violated the Fourth Amendment.[79] At the outset, the Court rejected the contention that the telephone booth at issue was less deserving of Fourth Amendment protection simply because Katz was still visible to the public while inside it.

> But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll

**67.** *Berger*, 388 U.S. at 44-45, 87 S.Ct. 1873.

**68.** *Id.*

**69.** *Id.*

**70.** *Id.* at 45, 87 S.Ct. 1873.

**71.** *Id.* at 59, 87 S.Ct. 1873.

**72.** *Id.* at 55, 87 S.Ct. 1873.

**73.** *Id.* at 56, 87 S.Ct. 1873.

**74.** *Id.* at 58, 87 S.Ct. 1873.

**75.** 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**76.** *Id.* at 348, 88 S.Ct. 507.

**77.** *Id.*

**78.** *Id.* at 348-49, 88 S.Ct. 507.

**79.** *Id.* at 359, 88 S.Ct. 507.

that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world.[80]

Consequently, the Court held that the FBI agents had violated Katz's privacy even without a physical intrusion into the public phone booth to record his conversation.[81]

In contrast to *Berger*, the Court agreed that the surveillance at issue in *Katz* was narrowly circumscribed.[82] The Government argued that the surveillance was limited in scope and duration to the specific purpose of establishing the contents of Katz's unlawful telephonic communications.[83] Moreover, the agents confined the surveillance to brief periods during which Katz used the phone booth, and they took great care to only record Katz's side of the conversation.[84] According to the Court, "[A] duly authorized magistrate, properly notified of the need for such investigation, specifically informed of the basis on which it was to proceed, and clearly apprised of the precise intrusion it would entail, could constitutionally have authorized, with appropriate safeguards, the very limited search and seizure that the Government asserts in fact took place."[85] Nevertheless, the Court held that the Government was still required to get a warrant, and because it did not, the recording violated Katz's privacy.[86]

Notably, the "reasonable expectation of privacy" test was first articulated in Justice Harlan's concurring opinion in *Katz*. Justice Harlan recognized, as did the majority, that the Fourth Amendment protects "people, not places," but he further noted that explaining what protection it affords those people still required reference to a "place."[87]

My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus, a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.[88]

In his view, "[t]he point is not that the booth is 'accessible to the public' at other times ... but that it is a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable."[89]

Neither *Berger* nor *Katz* turned upon the risk that the parties to the conversation might repeat the conversation to someone else. Indeed, Berger, as a go-between, was expected to divulge the information gleaned in one conversation with the other member of the conspiracy and

---

**80.** *Id.* at 352, 88 S.Ct. 507 (internal citations omitted).

**81.** *Id.* at 352-53, 88 S.Ct. 507.

**82.** *Id.* at 354, 88 S.Ct. 507.

**83.** *Id.*

**84.** *Id.*

**85.** *Id.*

**86.** *Id.* at 359, 88 S.Ct. 507.

**87.** *Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring).

**88.** *Id.*

**89.** *Id.*

vice versa. Nevertheless, the conversations were still private and the placement of an electronic eavesdropping device in a private office that Berger visited violated Berger's expectation of privacy.

Additionally, the content of the communications itself played no role in the Court's analysis. The focus was on whether law enforcement had invaded a privacy interest in order to surreptitiously record the conversations at issue. The FBI's efforts to limit its electronic eavesdropping to only the illegal betting did not lessen the intrusion into Katz's privacy.

 But most significantly, the expectation-of-privacy standard announced in *Katz* necessarily evaluates the place in which the conversation occurred in order to determine whether a person has an expectation of privacy in his or her conversation.[90] Long frames the issue as whether

Coach Townsend has an expectation of privacy in his speech, and so did the court of appeals. *Katz* makes clear that the legal question is answered by considering the circumstances in which Coach Townsend gave his speech, not what Coach Townsend said or whether he had, in the past, been overheard.[91]

**2. Factors Supporting An Expectation of Privacy**

The United States Supreme Court clarified in *Smith v. Maryland* that Justice Harlan's formulation of the expectation-of-privacy test was implicit in the majority holding in *Katz*.[92]

This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy,"—wheth-

---

**90.** *Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring). We reached the same conclusion in *Crosby v. State*, 750 S.W.2d 768, 779 (Tex. Crim. App. 1987) ("To a large degree the determination of whether an individual has a reasonable expectation of privacy depends upon the location or situs of that individual at the time of the questioned search."); *See also Liebman v. State*, 652 S.W.2d 942, 945 (Tex. Crim. App. 1983) ("While the design of the 'place' in which appellants were observed by the officers is important . . . its relevance is in reflecting the inherent opportunity the individual had for privacy in the "place" and the steps he actually took to avail himself of that opportunity.").

**91.** In *Katz,* the defendant had an expectation of privacy in the public telephone booth even though his communication was actually intercepted by being overheard outside of the telephone booth. 389 U.S. at 348, 359, 88 S.Ct. 507. This is also consistent with the United States Supreme Court's more recent move to consider whether property rights have been violated when determining the applicability of the Fourth Amendment. *See United States v. Jones,* 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (holding that commission

of trespass by placing a GPS tracking device on the undercarriage of the defendant's Jeep violated the Fourth Amendment). In *Florida v. Jardines,* for example, the drug-dog's "interception" of the smell of marijuana outside the home violated the Fourth Amendment because the officer had to intrude upon the homeowner's property rights for the dog to be able to intercept the scent. 569 U.S. 1, 133 S.Ct. 1409, 1417, 185 L.Ed.2d 495 (2013). In this way the *Katz* reasonable-expectations standard "has been *added to,* not *substituted for,*" the traditional property-based understanding of the Fourth Amendment. *Jones,* 565 U.S. at 409, 132 S.Ct. 945. We do not need to evaluate whether a defendant's property interest gives rise to a socially-recognized privacy interest because we can simply conclude that it does by resort to determinations based on property law. *See O'Connor v. Ortega,* 480 U.S. 709, 730, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (Scalia, J., concurring) ("A man enjoys Fourth Amendment protection in his home, for example, even though his wife and children have the run of the place—and indeed, even though his landlord has the right to conduct unannounced inspections at any time.").

**92.** 442 U.S. at 740, 99 S.Ct. 2577.

er, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'"—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.[93]

As mentioned above, this standard is applied when determining whether a person has "standing" to challenge a search by law enforcement.[94] Notably, the Supreme Court recognized that a person can have standing to complain about a search of a workspace even though he shares it with several other people.[95] Even though an employee might share his office with other people who have equal access to the office, the employee can still reasonably expect that he will not be disturbed except by personal or business invitees.[96] Sharing an otherwise private area with others—and the corresponding risk that those others might divulge something subjectively considered private—does not defeat the reasonableness of an employee's expectation of privacy.[97] As the late Justice Scalia noted, "It is privacy that is protected by the Fourth Amendment, not solitude."[98]

 We have explained that courts look to a variety of factors when deciding whether a person has a reasonable expectation of privacy in a place or object searched, factors such as whether:

(1) the person had a proprietary or possessory interest in the place searched;

(2) the person's presence in or on the place searched was legitimate;

(3) the person had a right to exclude others from the place;

(4) the person took normal precautions, prior to the search, which are customarily taken to protect privacy in the place;

(5) the place searched was put to a private use; and

(6) the person's claim of privacy is consistent with historical notion of privacy.[99]

This list of factors is not exhaustive, however, and none is dispositive of a particular assertion of privacy; rather we examine the circumstances in their totality.[100] As the United States Supreme Court observed in *Rakas v. Illinois*, "One of the main rights attaching to property is the right to exclude others, . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."[101]

 Consideration of whether a legitimate expectation of privacy existed in this case is also affected by its unique posture. When reviewing courts conduct a standing analysis in the context of a motion to suppress, oftentimes several overlapping concepts are combined. Most often, a reviewing court will consider whether a particular defendant had a "legitimate" expectation of privacy—a sub-

93. *Id.* (internal citations omitted).

94. *See, e.g., State v. Granville,* 423 S.W.3d 399, 405 (Tex. Crim. App. 2014).

95. *Mancusi v. DeForte,* 392 U.S. 364, 368-69, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

96. *Id.* at 369, 88 S.Ct. 2120.

97. *Id.*

98. *O'Connor,* 480 U.S. at 730, 107 S.Ct. 1492 (Scalia, J., concurring).

99. *Granados v. State,* 85 S.W.3d 217, 223 (Tex. Crim. App. 2002).

100. *Id.*

101. 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

jective and objectively reasonable expectation of privacy—in an area searched.[102] But sometimes, reviewing courts answer the question of standing by determining whether there has been an intrusion upon an expectation of privacy, i.e., whether a search has occurred.[103] And other times, reviewing courts might discuss an expectation of privacy but uphold a search as reasonable under the Fourth Amendment because the expectation of privacy is low and the corresponding intrusion minimal.

■ This case is not a review of a motion to suppress. Instead, we are tasked with determining whether the evidence adduced in this case satisfies the definition of "oral communication" as a matter of law. We are not concerned with the reasonableness of C.L.'s "search" so we do not need to consider how heightened or diminished Coach Townsend's expectation of privacy was. But, as discussed above, a determination of whether a legitimate expectation of privacy has been violated requires examination both of the privacy interest and the intrusion. Given the legislative intent behind the statute at issue, we read the statute consistent with the standard set out in *Berger* and *Katz*. Under those cases, the intrusion at issue was either the placement of an electronic listening device within a private area or the placement of the listening device on the outside of a private area in order to seize the information inside a private area. In this case, the intrusion at issue is similar to the one present in *Berger*, the placement of an electronic listening device within an otherwise private area, the girls' locker room.

The bulk of the factors we traditionally consider when determining whether an expectation of privacy is objectively reasonable weigh in favor of finding that Coach Townsend's expectation of privacy in the team's locker room was legitimate. The locker room was being put to a private use and Coach Townsend was legitimately present in that locker room. While he did not own the property, he had a greater proprietary or possessory interest in the locker room than C.L. in the same way that Katz had a greater proprietary or possessory interest in the public phone booth than the FBI agents. And, Coach Townsend's position as coach authorized him to exclude people from the locker room; his understanding that the room was only for the coaches and the team members was unchallenged. C.L. passing herself off as a "team manager" to gain access to the locker room further supports a finding that the locker room was at least temporarily private. Though Townsend himself did not take additional precautions to protect his privacy in the room, there was evidence that the police had prevented one attempt by C.L. from entering the locker room at another game at another school. And, the two sets of doors at the entry to the locker room showed a design establishing an additional layer of privacy protection to those inside the room. Historical notions of privacy, however, appear to be harder to weigh.

### 3. A Locker Room Is Not a Classroom

■ Of course, part of the difficulty in determining what historical notions of privacy apply under these circumstances

**102.** *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) (applying expectation of privacy test to determine standing).

**103.** *State v. Hardy*, 963 S.W.2d 516, 523 (Tex. Crim. App. 1997) ("There is no question that the drawing of blood from a person's body infringes an expectation of privacy recognized by society as reasonable.") (citing *Skinner v. Railway Labor Exec. Assn.*, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)).

flows from the difficulty in characterizing the "place" in which Coach Townsend's communication was recorded. To a large degree the determination as to whether an individual has a reasonable expectation of privacy depends upon the location or situs of that individual at the time of the questioned search.[104] While the design of the "place" in which a person is observed is important, its relevance is in reflecting the inherent opportunity the individual had for privacy in the "place" and the steps he actually took to avail himself of that opportunity.[105] Though the "place" at issue in this case was designed to be a locker room, albeit one that could be put to multiple uses, the court of appeals characterized it as a "classroom setting." An examination of the cases the court of appeals relied upon leads us to the conclusion that this is not an accurate characterization.

Understandably, the court of appeals relied upon *Roberts v. Houston Independent School Dist.*, the only case in Texas that addresses the expectation of privacy held by a teacher in her classroom.[106] But there, the recording undisputedly took place in an otherwise "public" classroom.[107] That is, in *Roberts*, the record showed that the teacher at issue "was videotaped in a public classroom, in full view of her students, faculty members, and administrators."[108] There was nothing to indicate that there were any restrictions upon entry into the classroom. Moreover, the teacher in that

case was even told that she would be videotaped before she was actually videotaped.[109] There was simply no room for privacy at all. This stands in marked contrast to the environment in which Coach Townsend spoke to his basketball team.

Problematically, the strength in the court of appeals' analogy to *Roberts* lay in the content of the communication collected rather than the circumstances surrounding it. The key to the court of appeals' analysis comes from its reliance upon the observation in *Roberts* that "the activity of teaching in a public classroom does not fall within the expected zone of privacy."[110] The court of appeals appears to have taken this statement to mean that any time the communication between a teacher and a student amounts to "teaching" the teacher lacks any expectation of privacy in the conversation.

But as discussed above, neither *Berger* nor *Katz* turned upon the determination that the content of the communication was less deserving of privacy. Berger's communication in furtherance of the conspiracy did not render the environment in which he made statements less private. Neither did Katz's illicit wagering render the phone booth he was speaking in more public. And in *Roberts* it was the openness of the classroom that made the teacher's expectation of privacy unreasonable, not the lesson she was teaching. The statutory def-

104. *Crosby*, 750 S.W.2d at 779.

105. *Liebman*, 652 S.W.2d at 945.

106. 788 S.W.2d 107, 111 (Tex. App.—Houston [1st Dist.] 1990, writ. denied).

107. *Id.*

108. *Id.*

109. *Id.* at 110-11 ("Under this point, appellant argues that she had an expectation of privacy in her classroom to be free from intrusion by videotaping, and that by videotap-

ing her performance, over her objection, the school district violated her right of privacy as well as its own policy.").

110. *Id.* at 111; *see also Long*, 469 S.W.3d at 309 ("In reaching this conclusion, the court reasoned that 'the activity of teaching in a public classroom does not fall within the expected zone of privacy' because '[t]here is no invasion of the right of privacy when one's movements are exposed to public views generally.'").

inition of "oral communication" does not exempt certain subjects of communication from protection, and the court of appeals erred in determining that the content of the communication in this case changed the character of the environment in which Coach Townsend spoke.[111] In this we agree with the State; Section 16.02, and by extension Article 18.20, concern themselves with the capture, not the content, of the communication.

Even more problematic is the court of appeals' reliance upon *Evens v. Super. Ct. of L.A. County*. There, the issue was not whether the surreptitious recording of a teacher violated a reasonable expectation of privacy.[112] Instead, the plaintiff, a public school teacher, claimed that a student's surreptitious videotape of her classroom lecture could not be admitted into evidence because it violated California statutes, specifically Section 51512 of the California

Education Code and Section 632 of the California Penal Code.[113] The plaintiff in *Evens* based her arguments in that case upon her interpretation of these California statutes, not the Fourth Amendment. More simply put, the *Evens* court faced an issue of statutory privilege rather than one of constitutional privacy.

Finally, the court of appeals also relied upon *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*. But the circumstances at issue in *Plock* mirror those in *Roberts*; the teachers there complained that open and notorious videotaping of their otherwise public classroom violated their expectation of privacy.[114] Specifically, the court's decision in *Plock* turned upon the fact that "classrooms are open to students, other faculty, administrators, substitute teachers, custodians, and on occasion, parents."[115] And, the court relied upon *Evens*

---

111. Even if we were to regard "teaching" as conduct rather than speech, the mere fact that an individual defendant can use a particular environment for a different purpose than it was designed for does not alter societal expectations of that environment. The ability to use a public bathroom stall for oral sex, for example, does not convert that bathroom into a bedroom though both areas are indisputably private areas. *Buchanan v. State*, 471 S.W.2d 401, 404 (Tex. Crim. App. 1971) (recognizing privacy interest in public bathroom stall even though defendant was not using bathroom stall to go to the bathroom). And regardless of whether "teaching" amounts to speech or expressive conduct, we have a duty to construe the statute in a content-neutral fashion to avoid constitutional violations. *Long v. State*, 931 S.W.2d 285, 295 (Tex. Crim. App. 1996) (recognizing our general duty to interpret statutes in order to avoid constitutional violations).

112. *Evens v. Super. Ct. of L.A. County*, 77 Cal.App.4th 320, 91 Cal.Rptr.2d 497 (1999).

113. *Id.* at 322, 91 Cal.Rptr.2d 497. *See also* CAL. EDUC. CODE § 51512 ("The Legislature finds that the use by any person, including a pupil, of any electronic listening or recording device in any classroom of the elementary

and secondary schools without the prior consent of the teacher and the principal of the school given to promote an educational purpose disrupts and impairs the teaching process and discipline in the secondary schools, and such use is prohibited. Any person, other than a pupil, who willfully violates this section shall be guilty of a misdemeanor."); CAL. PENAL CODE § 632(a) ("A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.").

114. *Plock v. Bd. of Educ. of Freeport Sch. Dist. 145*, 545 F.Supp.2d 755, 756 (N.D. Ill. 2007).

115. *Id.* at 758.

to inform its expectation-of-privacy analysis even though *Evens* did not determine whether the teacher filing suit had a reasonable expectation of privacy in her classroom.[116] In effect, *Plock* combines both *Roberts* and *Evens*, but because neither case is an apt analogy to the circumstances present in this case, combining them does not make *Plock* fit this case any better than *Roberts* or *Evens*.

The environments at issue in *Roberts*, *Evens*, and *Plock* were public with no stated restrictions upon access at the time of the communications in question. But the circumstances surrounding the communication in this case are more restrictive with undisputed limits upon access to the area where the communication took place. Further, none of these cases stand for the proposition that the content of communication determines whether a teacher has an expectation of privacy in his or her communication with students; an otherwise private environment does not become public simply because the teacher is "teaching." The court of appeals erroneously relied upon these cases to simply equate a girls' locker room with a "classroom setting."[117]

### 4. Historical Notions of Privacy In Locker Rooms

 Of course, we have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable.[118] Instead we give weight to such factors as the intention of the uses to which the individual has put a location and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.[119] As the United States Supreme Court stated in *Rakas v. Illinois*, "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."[120]

While we often note that we determine whether a person has a legitimate expectation of privacy by looking to "historical notions of privacy," we typically resort to other cases examining privacy in similar settings unless the setting itself provides an obvious answer. For example, we held that historical notions of privacy cut against any expectation of privacy in a jail cell in *Oles v. State* because the conclusion was obvious.[121] However, in *Matthews v.*

---

116. *Id.* ("Any expectations of privacy concerning communications taking place in special education classrooms such as those subject to the proposed audio monitoring in this case are inherently unreasonable and beyond the protection of the Fourth Amendment.").

117. Ultimately, identifying what constitutes a "classroom" for a particular type of teacher presupposes a *per se* rule that teacher-student communications are exempt from the wiretap statute. Had that been the legislature's intent, it would have included an affirmative defense in that regard within the statute. *See, e.g.*, *United States v. Giordano*, 416 U.S. 505, 514, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (noting that the purpose of the federal wiretap statute was to prohibit all interceptions of oral and

wire communications except those specifically provided for in the Act).

118. *O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492.

119. *Oliver v. United States*, 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

120. 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

121. *Oles v. State*, 993 S.W.2d 103, 109 (Tex. Crim. App. 1999) ("No situation imaginable is as alien to the notion of privacy than an arrestee sitting in a jail cell, completely separated from his effects that are lawfully controlled and inventoried by the very police that are investigating him.").

*State*, we determined that the defendant had a reasonable expectation of privacy in a borrowed car by, as one might expect, looking at cases analyzing searches of borrowed cars and the like.[122] So, to determine whether Coach Townsend's subjective expectation of privacy is consistent with historical notions of privacy we must examine cases involving locker rooms and similar environments.

On the one hand, the United States Supreme Court has noted that public school locker rooms are not necessarily notable for the privacy they afford the students because no individual dressing rooms are provided, showers are generally communal, and some toilet stalls do not have doors.[123] In that case, *Vernonia School Dist. 47J v. Acton*, the Court considered the reasonableness of a school district's random urinalysis program for student athletes.[124] While the Court noted that the individual students had an expectation of privacy in their "excretory function," it upheld the policy as a reasonable intrusion upon the student's expectation of privacy because the intrusion into that expectation was negligible.[125] Nevertheless, the Court did not hold that the students in the bathroom had no expectation of privacy at all, only that the intrusion was reasonable be-cause the expectation of privacy was not great and the intrusion was minimal.[126]

Indeed, when it comes to the issue of covert surveillance in a public school locker room, at least one court has been quick to note that the students still maintain some expectation of privacy.[127] In *Brannum v. Overton County School Board*, the Sixth Circuit considered a legal challenge by students to a school's installation of surveillance cameras in student locker rooms that recorded them changing clothes.[128] There, a girls' basketball team visited another school for a game and noticed a camera in the girls' locker room.[129] After they complained, it was discovered that the camera had recorded a number of children changing clothes over a period of months.[130] In holding that the school district's use of surveillance cameras infringed upon the student's reasonable expectation of privacy, the Sixth Circuit acknowledged a public school student's diminished expectation of privacy, but nevertheless rejected the suggestion that the expectation of privacy was non-existent.[131] According to the Sixth Circuit, it is reasonable for students using a school locker room to expect that no one, especially school administrators,

122. *Matthews v. State*, 431 S.W.3d 596, 607 (Tex. Crim. App. 2014).

123. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

124. *Id.* at 651-52, 115 S.Ct. 2386.

125. *Id.* at 658, 115 S.Ct. 2386 (noting that students providing a sample did so in conditions nearly identical to those typically encountered in public restrooms, which men, women, and especially school children use daily).

126. *Id.* at 664-65, 115 S.Ct. 2386 ("Taking into account all the factors we have considered above—the decreased expectation of pri-vacy, the relative unobtrusiveness of the search, and the severity of the need met by the search—we conclude Vernonia's Policy is reasonable and hence constitutional.").

127. *Brannum v. Overton County School Board*, 516 F.3d 489, 496 (6th Cir. 2008).

128. *Id.* at 491-92.

129. *Id.* at 492.

130. *Id.* at 492-93.

131. *Id.* at 496.

would videotape them, without their knowledge.[132]

However, the Court did not focus solely upon the privacy interest attendant to a school locker room; it also focused upon the students' significant privacy interest·in their unclothed bodies.[133] To that extent, the case appears somewhat distinguishable from the facts presented here. After all, one· could suggest that we· should only focus on the complainant's expectation of privacy in this case, not the expectation of privacy of·the members of his team.

 Yet, it must be remembered we are·considering the scope of a definition in a statute rather than engaging in the traditional expectation-of-privacy analysis attendant to a specific search.[134] The terms of Section 16.02 making the interception of oral communication a crime protects all parties· to a conversation.[135] By providing an affirmative defense to the crime for a party to the communication, Section 16.02 necessarily limits the application of the statute to interception of oral

communication by uninvited third parties.[136] When interpreting the scope of this statute, the privacy interest of the other parties to the communication, the students, should be considered when assessing societal expectations regarding the locker room.[137]

When it comes to surreptitious electronic surveillance·of locker rooms generally, courts in other jurisdictions have reached mixed conclusions. In *Jones v. Houston Community College System*, the United States District Court for the Southern District of Houston recognized that it is objectively reasonable to expect privacy·in·a locker room where access was restricted to those who used it.[138] Similarly, the United States District Court for the Central District of California held that police officers had a reasonable expectation of privacy in a work locker room that was not open to the public even·though it lacked total privacy.[139]

Even when courts do not recognize an expectation of privacy in a locker room,

132. *Id.*

133. *Id.*

134. *Moore v. State*, 371 S.W.3d 221, 227 (Tex. Crim. App. 2012) (noting that appellate construction of a statute may be necessary to resolve an evidence-sufficiency complaint when alternative statutory interpretations would yield dissimilar outcomes).

135. Tex. Penal Code § 16.02(b); Tex. Penal Code § 16.02(c)(4)(a).

136. Tex. Penal Code § 16.02(c)(4)(a). Of course, as discussed above, when dealing with a conversation with a child, parents of the child are essentially deemed invited to any conversation someone has with their child because they have the authority to vicariously consent to the recording of their child's conversation. *Alameda*, 235 S.W.3d at 223 (holding that parent may vicariously consent to the recording of conversations with their child provided the parent has a reasonable, good

faith belief that consent is in the child's best interest). In this case, Long had not vicariously consented to a recording of a communication with one of her·own children; she orchestrated the recording of communication with the children of other parents.

137. In *State v. Hardy*, we observed that "[i]n determining whether an expectation of privacy is viewed as reasonable by 'society,' the proper focus under the Fourth Amendment is upon American society as a whole, rather than a particular state or other geographic subdivision." 963 S.W.2d at 523.

138. *Jones v. Houston Community College System*, 816 F.Supp.2d 418, 434 (S.D. Tex. 2011).

139. *Trujillo v. City of Ontario*, 428 F.Supp.2d 1094, 1104-05 (C.D. Cal. 2006); *see also Carter v. County of Los Angeles*, 770 F.Supp.2d 1042, 1049 (C.D. Cal. 2011) (noting expectation of privacy in secure dispatch room not open to the public because room was also used for resting, eating, and napping).

they nevertheless recognize an expectation of privacy in not being recorded. In *DeVittorio v. Hall*, the United States District Court for the Southern District of New York held that police officers lacked a reasonable expectation of privacy in their locker room because it was accessible by everyone in the department, included mailboxes, bulletin boards, and a separate shower and bathroom area with its own door.[140] However, the court noted that the officers did have an expectation of privacy from covert video surveillance while in the locker room because the room is used for private functions, such as changing clothes.[141] And the United States District Court for the District of Puerto Rico, in an unpublished opinion, seemed to recognize that federal police officers had an expectation of privacy in a locker room-break area, but only to the extent that those officers could not be videotaped.[142] Indeed, many courts have recognized the intrusiveness of covert video surveillance.[143]

While we have never had the occasion to consider the question of whether a locker room is private, we have considered the privacy interests attendant to a dressing room. In *Crosby v. State*, a "well-known nightclub and recording entertainer"

named David Crosby[144] had contracted with a Dallas nightclub to perform at the club.[145] As part of the contract, the owner had furnished Crosby with exclusive use of a private dressing room.[146] The entrance to the dressing room was demarcated by an opaque curtain, which, when drawn, completely shielded anyone from viewing inside the room.[147] Crosby also placed a private sentry in front of the drawn curtain, whose obvious duties entailed excluding unwanted intruders.[148] We held that Crosby's subjective expectation of privacy in his dressing room was objectively reasonable because a dressing room reflects an inherent opportunity for privacy and Crosby had taken steps to maintain that privacy.[149]

In contrast, we have recognized there is no legitimate expectation of privacy in a Foley's dressing room, but only because in that case there was a sign informing the patron that the dressing room was under surveillance.[150] In *Gillett v. State*, 588 S.W.2d 361 (1979), the defendant went into the dressing room at Foley's in order to steal a sweater.[151] A female security guard entered an adjoining room and looked into the defendant's stall to view the defendant

140. *DeVittorio v. Hall*, 589 F.Supp.2d 247, 256-57 (S.D.N.Y. 2008).

141. *Id.* at 257.

142. *Avila v. Valentin–Maldonado*, No. 06-1285 (RLA), 2008 WL 747076, at *13 (D. Puerto Rico March 19, 2008) (not designated for publication).

143. *See, e.g., United States v. Taketa*, 923 F.2d 665, 678 (9th Cir. 1991) (holding that one employee had an expectation of privacy from covert video surveillance by the government in another employee's office); *United States v. Cuevas–Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) ("[I]ndiscriminate video surveillance raises the specter of the Orwellian state."); *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984) ("We think it … unarguable that

television surveillance is exceedingly intrusive.").

144. Yes, *that* David Crosby. *See e.g.* THE BYRDS, *Eight Miles High,* on FIFTH DIMENSION (Columbia Records 1966).

145. *Crosby,* 750 S.W.2d at 770.

146. *Id.*

147. *Id.* at 773.

148. *Id.*

149. *Id.* at 779-80.

150. *Gillett,* 588 S.W.2d at 363.

151. *Id.* at 362.

putting the sweater into her purse.[152] We held that defendant lacked an expectation of privacy because the posted sign "was notice that one could not expect privacy."[153] No such sign was posted in the girls' locker room in this case.[154]

At a minimum, every court that has considered the issue of covert video surveillance within a locker room has recognized that those within the locker room have a reasonable expectation of privacy to be free from such surveillance. Many recognize an expectation of privacy in locker rooms generally. And while we have never before considered whether a school locker room reflects an inherent opportunity for privacy, similar to a bathroom stall or a public telephone booth, we have made that determination in the context of a dressing room. A person in a locker room does not expect someone to sneak into that locker room and record them; courts considering the issue have recognized that this expectation is reasonable.

5. "Always Subject to Dissemination"

■ Despite all this, Long argues that the court of appeals correctly determined that Coach Townsend's speech to his team was not "private" because anything he says to students is always subject to dissemination by those students.[155] As discussed above, this theory originates with *Evens v. Superior Court of L.A. County* as

a matter of California state law rather than under the expectation-of-privacy standard set out in *Katz*.[156] At most, *Evens* holds that the lack of a teacher-student privilege informed the determination that a student's surreptitious recording of her teacher in a public classroom did not violate California statutes.[157]

We have held that the absence of a privilege may be some evidence of societal expectations when evaluating whether a person has an expectation of privacy in his or her medical records.[158] As discussed above, in *State v. Hardy*, we recognized that the drawing of blood and analysis of its contents infringes upon a person's legitimate expectation of privacy, but the seizure of those medical records by law enforcement does not.[159] In reaching that conclusion we were careful to distinguish between privacy and privilege.

[T]he absence or inapplicability of a privilege does not foreclose the existence of a societally recognized expectation of privacy. A privilege stands as an absolute bar to the disclosure of evidence (absent an exception) while the Fourth Amendment merely imposes certain reasonableness requirements as a condition for obtaining the evidence. That medical records have not been given the absolute protection of a privilege does not mean they might not possess the qualified protections embodied by the Fourth

---

152. *Id.*

153. *Id.* at 363.

154. Notably, both *Roberts* and *Plock*, cases relied upon by Appellant, dealt with situations where the teachers complaining about being recorded were told beforehand that they were being recorded. *See Roberts*, 788 S.W.2d at 110-11; *Plock*, 545 F.Supp.2d at 757.

155. The court of appeals even noted that Coach Townsend stated in his halftime speech

that he expected his students to talk to their parents about what he said. *Long*, 469 S.W.3d at 311.

156. *Evens*, 77 Cal.App.4th at 324, 91 Cal. Rptr.2d 497.

157. *Id.*

158. *Hardy*, 963 S.W.2d at 525.

159. *Id.* at 523, 527.

Amendment.[160]

Notably, we were not concerned, in *Hardy*, with dissemination of the test results at issue; we addressed the seizure of the results themselves. If we were to draw any analogy between this case and *Hardy* it would be to note that the intrusion in this case is more akin to the taking of the defendant's blood rather than the subpoena of his medical records.[161] And, as discussed above, *Katz* and *Berger* were concerned with the recording of the communication in those cases, not the information contained within the conversations. Though it is true that a teacher should expect that students will relay information about their lesson to others including parents, that fact did not equate to a sign in the locker room alerting Coach Townsend to the fact that he was under surveillance.

This is not to say that a school district, when faced with parental complaints regarding a particular teacher or coach, lacks the authority to intercept communications between school employees and students. As discussed above, we are not called upon to address the reasonableness of a particular search under the Fourth Amendment. Given a school district's interest in providing a safe and effective educational environment for students, a school district could certainly fashion surveillance protocols tailored to further an interest in monitoring communications between adults and students with only minimal intrusion upon existing privacy interests. And providing some form of notice to those under surveillance that such communications in otherwise restricted areas are subject to electronic interception would render any subjective expectation of privacy objectively unreasonable under the elec-

tronic eavesdropping statute.[162] But those are not the circumstances presented in this case.

## V. Conclusion

We conclude that the definition of "oral communication" found in Article 18.20 of the Code of Criminal Procedure incorporates the reasonable expectation of privacy test as set out in *Katz* and *Berger*. Having reached that conclusion, we further hold that under the circumstances presented in this case, there was sufficient evidence for the jury to find that C.L. intercepted an "oral communication" because Coach Townsend had a subjective expectation of privacy that society is prepared to regard as objectively reasonable when he uttered that communication within the girls' locker room. Consequently, there was sufficient evidence supporting the jury's verdict that Appellant had violated Section 16.02 of the Texas Penal Code for her part in encouraging the interception of that oral communication and sharing copies of it with the school board. We reverse the court of appeals and affirm Appellant's conviction.

Richardson, J. filed a dissenting opinion in which Alcala, and Walker, JJ. joined.

Richardson, J., filed a dissenting opinion in which Alcala and Walker, JJ. joined.

## DISSENTING OPINION

Wendee Long instructed her daughter to record Coach Townsend speaking to his high school girls' basketball team. She later disclosed that recording to members of the school board. The majority holds that the recorded locker-room speeches were "oral communications" because Coach Townsend had a reasonable expectation of

160. *Id.* at 524.

161. *Id.* at 523-24.

162. *See, e.g., Roberts,* 788 S.W.2d at 111.

privacy in those speeches. Based on that conclusion, the majority reverses the Eighth Court of Appeals and reinstates Long's conviction under Section 16.02, a second degree felony. Respectfully, I disagree with that decision.[1]

A person violates the Texas wiretap statute, committing a felony offense under Section 16.02 of the Texas Penal Code, if she intentionally "procures another person" to intercept an oral communication.[2] An "oral communication" is defined by statute as a communication "uttered by a person exhibiting an expectation that the communication is not subject to interception *under circumstances justifying that expectation.*"[3] The Texas wiretap statute is substantially similar to its federal counterpart under 18 U.S.C. §§ 2510-2521.[4] Moreover, when we compare the federal statutory definition of "oral communication," it is almost identical to the Texas statutory definition.[5] This definition of

"oral communication" incorporates the Fourth Amendment's legitimate-expectation-of-privacy standard.[6] But, even if a person has a subjective expectation of privacy in the words they utter to another, if the circumstances surrounding the uttering of that communication do not *justify* that subjective expectation (i.e., society is not willing to recognize that subjective expectation of privacy as objectively reasonable), then the communication is *not* protected from "interception" by Section 16.02.[7]

I disagree with the majority because I do not believe that Coach Townsend's locker-room speeches to his basketball team were "oral communications" as that term is used in Section 16.02(b)(1). The circumstances under which Coach Townsend uttered the locker room speeches did not justify his subjective expectation of privacy.[8] Therefore, I would affirm the court of

---

1. The issue before us is one of first impression—that is, with all other factors being equal, does a coach have a greater expectation of privacy than a teacher in a classroom setting simply because he is speaking to students in a locker room? More precisely, if a coach's locker room. "half-time pep talk" is recorded without the permission or knowledge of anyone in the locker room, is it a violation of Section 16.02? The Court of Appeals unanimously said no, and I agree.

2. TEX. PENAL CODE § 16.02(b)(1).

3. TEX. CODE CRIM. PROC. art. 18.20, § 1(2) (emphasis added).

4. *Alameda v. State*, 235 S.W.3d 218, 220, 222 (Tex. Crim. App. 2007) (noting that "the federal wiretap statute is substantively the same as the Texas statute").

5. 18 U.S.C. § 2510(2) defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include

any electronic communication." Texas Code of Criminal Procedure art. 18.20 § 1(2) defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation. The term does not include any electronic communication."

6. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("[W]e have expressly held that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording or oral statements overheard.").

7. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

8. The fact that Wendee Long was not the principal of the school employing Coach Townsend, he was not at her school at the time of the alleged offense, and the fact that her daughter was not on any team coached by Coach Townsend, do not affect my opinion that he still did not have a legitimate expectation of privacy in the communications at issue.

appeals, which held that Coach Townsend did not have a reasonable expectation of privacy under these circumstances, the recordings were not "oral communications" within the meaning of Section 16.02, and thus Long did not violate Section 16.02(b)(1).[9]

The determination of whether a person has a reasonable expectation of privacy in his communications "is made on a case-by-case basis and is highly fact determinative."[10] It is therefore necessary to look at the "circumstances" under which Coach Townsend uttered the words that were recorded. To look at the "circumstances," we should consider all of the details surrounding the words that were uttered. No one factor or detail should be viewed in isolation or removed from consideration.

However, the majority places great weight on the fact that Coach Townsend gave his speech to the players in a locker room, emphasizing that locker rooms are private, that Coach Townsend was "legitimately present" in the locker room, and that access to the locker room was restricted. So, reasons the majority, society would therefore regard Coach Townsend's expectation of privacy in the speeches he gave in the locker room as objectively reasonable. But, the half-time speech video clearly reflects that Coach Townsend had no expectation of privacy in what he was saying to the team. When Coach Townsend was giving his half-time speech, the video shows that the door was left wide open,[11] and there appears to have been three other coaches in the room. Coach Townsend was speaking in a loud voice, and he exhibited no body language or vocal inflections that demonstrated any intention to keep the communication private *because* it was being given in a locker room. Yet, the majority was unpersuaded by the appellate court's characterization of the locker room as a "classroom setting."[12] Historical notions of locker-room privacy provided a basis for the majority to distinguish the cases relied on by the court of appeals.

But, the court of appeals's analysis equating the locker room to a classroom under these facts rings true. A high school girls' basketball coach is an Educator with great power to influence and impress upon student athletes the values of teamwork,

9. *Long v. State*, 469 S.W.3d 304, 306 (Tex. App.—El Paso 2015).

10. *Id.* at 308 (citing *O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), which notes that, given the great variety of work environments in the public sector, whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis).

11. *Cf. Katz*, 389 U.S. at 361, 88 S.Ct. 507 ("The critical fact in this case is that '(o)ne who occupies it, (a telephone booth) shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume' that his conversation is not being intercepted.").

12. *See Roberts v. Houston Indep. Sch. Dist.*, 788 S.W.2d 107, 111 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (a public school teacher has no reasonable expectation of privacy while teaching in a public classroom); *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 545 F.Supp.2d 755, 758 (N.D. Ill. 2007) (special education teachers had no reasonable expectation of privacy in communications in their classrooms). In *Evens v. Super. Ct. of L.A. County*, 77 Cal.App.4th 320, 91 Cal. Rptr.2d 497 (1999), the court's assessment that a teacher's communications in a classroom are not private was based at least in part on the fact that a teacher should expect "public dissemination" of his or her communications and activities since students usually discuss teacher's communications and activities with their parents, other students, other teachers, and administrators. Thus, realistically, said *Evens*, a teacher's expectation that their communications with students would remain private was unrealistic and thus unreasonable. *Id.* at 324, 91 Cal.Rptr.2d 497.

commitment, integrity, fairness, loyalty, responsibility, accountability, patience, self-discipline, and sportsmanship. This was clearly Coach Townsend's intent when he gave the locker-room speeches. This case does not involve the invasion of Coach Townsend's "innermost secrets." [13] He did not "utter words into the mouthpiece" of a telephone.[14] Rather, at the time that Coach Townsend was uttering the words that were recorded, he was *on the job.* Coach Townsend was providing what he clearly believed to be instructional communications to his players during and immediately after a game. Since a coach does not have a traditional classroom within which to educate his student athletes, anywhere that a coach addresses his or her team should be considered their "classroom."

Thus, while the location is an important consideration, it is not the sole consideration.[15] Nevertheless, to the same extent the majority factored in the location of the communication, it devalued the content of the communication. I would hold, however, that the content of the video and audio recordings is the best evidence that Coach Townsend did not have an expectation of privacy. The content of his communication is a very significant part of the "circumstances" surrounding the communication. When Coach Townsend gave his post-game

speech, a female coach also spoke to the team. Both coaches's speeches focused solely on the general performance of the players. Nothing about what was said or how it was said gave any indication that Coach Townsend intended the communication to be private. No game strategy was discussed; no team secrets were revealed.[16]

If we are to determine whether Coach Townsend's subjective expectation of privacy in his locker-room communications to the girls' basketball team is one that society is willing to recognize as reasonable, we must look at the totality of the circumstances, and that includes what was said and how it was said. A communication is only an "oral communication" under Section 16.02 if it is uttered by a person "under circumstances" that objectively justify that person's subjective expectation of privacy. Only then is the person's expectation of privacy considered objectively reasonable as well as subjectively reasonable.[17] No single factor should be determinative.[18]

As noted above, the content of Coach Townsend's speeches was 100% focused on what he believed was the necessary coaching of his players. Putting it mildly, the gist of his speeches was directed to the players's performance at the game, and emphasis was placed on their commitment

---

13. *Berger v. State of New York,* 388 U.S. 41, 63, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

14. *Katz,* 389 U.S. at 352, 88 S.Ct. 507.

15. *See Katz,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (noting that the Fourth Amendment protects people not places).

16. I understand that game secrets are game secrets, but even if this were a situation where a rival had eavesdropped on Coach Townsend's strategy session, that form of reprehensible cheating would likely result in a forfeit of the game or some other similar form of punishment.

17. *See Brugmann v. State,* 117 So.3d 39, 48-49 (Fla. App. 3rd Dist. 2013); *see also State v. Inciarrano,* 473 So.2d 1272 (Fla. 1985) (noting that factors to consider may include (1) the location where the communication took place; (2) the manner in which the communication was made; (3) the nature of the communication; (4) the intent of the speaker asserting protection at the time the communication was made; (5) the purpose of the communication; (6) the conduct of the speaker; (7) the number of people present; (8) the contents of the communication).

18. *State v. Duchow,* 310 Wis.2d 1, 749 N.W.2d 913, 920 (2008).

to the team and their need for improvement. To the extent that Coach Townsend even had a subjective expectation of privacy, nothing about what he said would support a finding that he was justified in having such an expectation of privacy.

Therefore, considering the totality of the circumstances in this case, I disagree with the majority's conclusion that Coach Townsend's speeches he gave to the girls' basketball team were made under circumstances that justified his subjective expectation of privacy. Because I do not believe that Coach Townsend had a legitimate expectation of privacy in such communications, respectfully, I dissent. Instead, I would affirm the decision of the Eighth Court of Appeals.