

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0176-25

## ISRAEL GARCIA HERNANDEZ, Appellant

### v.

## THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE THIRTEENTH COURT OF APPEALS WILLACY COUNTY

FINLEY, J., delivered the opinion of the Court in which RICHARDSON, NEWELL, KEEL, WALKER, and MCCLURE, JJ., joined. MCCLURE, J., filed a concurring opinion. SCHENCK, P.J., filed a dissenting opinion. YEARY, J., filed a dissenting opinion. PARKER, J., filed a dissenting opinion in which YEARY, J., joined.

**O P I N I O N**

Appellant was convicted of evading arrest or detention with a motor vehicle and was sentenced to two years' confinement, probated for three years' community supervision. Appellant challenges the sufficiency of the evidence supporting his conviction and contends that the initial traffic stop was unlawful. We conclude that a rational juror could not find beyond a reasonable doubt that the initial traffic stop was lawful. Consequently, we reverse the judgment of the court of appeals and render a judgment of acquittal.

I.      **Background**

a.  **Trial**

On March 17, 2020, at 10:16 p.m., a woman called 9-1-1 to report a suspicious four-door Chevrolet Silverado driving at a slow speed in a rural area of Willacy County. At 10:46 p.m., Officer Marcos Garcia arrived at the area the caller described and noticed only Appellant's pickup truck in the vicinity, driving down a dirt road. Appellant's truck was not a four-door Chevrolet Silverado. Officer Garcia turned onto the same dirt road and activated his emergency lights.[1] Appellant did not stop his vehicle in response to the emergency lights and continued driving down the dirt

_____

[1] The unit that Officer Garcia was driving at this time only had interior emergency lights and did not have a dash camera.

road at the same slow rate of speed. At 10:50 p.m., Appellant stopped and exited his vehicle to open a gate at the entrance of his brother's property. Officer Garcia also exited his vehicle, approached Appellant with his firearm drawn, and asked Appellant to identify himself. Appellant told Officer Garcia his name but did not provide physical identification. Appellant and Officer Garcia argued for approximately five minutes, and, after Officer Garcia unsuccessfully tried to take Appellant down by force, Officer Garcia tased Appellant and arrested him.

Appellant was charged by indictment with evading arrest or detention with a motor vehicle. TEX. PENAL CODE § 38.04(a). At trial, Officer Garcia testified that he knew this particular area to have "had a lot of incidences of human smuggling" of late. Officer Garcia also testified that he observed several residences in the area but no vehicles except Appellant's, which was driving on a rural road. Officer Garcia admitted he did not know for certain that Appellant's vehicle was the "suspicious" Chevrolet Silverado described by the 9-1-1 caller, but he "figured" it must be, because there were no other vehicles around, and Appellant was driving a pickup truck, though not a Chevrolet Silverado. Officer Garcia acknowledged that the thirty minutes it took him to arrive at the scene was "a lot of time for a vehicle to move in and out of the area." Officer Garcia also confirmed that Appellant did not "floor it"

after Officer Garcia turned on his emergency lights, and he had not witnessed any "violation of law."

Appellant did not file a motion to suppress and instead argued that the State could not meet its burden on the "lawful arrest" element.[2] After the State rested, Appellant moved for a directed verdict on the basis that the State had failed to meet its burden to prove the attempted detention was lawful. The trial court denied Appellant's motion. At the jury charge conference, Appellant did not ask for an Article 38.23 instruction.[3] The jury deliberated for several hours and sent eight notes to the trial court during its deliberations, two of which indicated they could not reach a unanimous verdict. The trial court gave the jury an *Allen*[4] charge and sent the jury back for further deliberations. The jury ultimately found Appellant guilty as alleged in the indictment.

---

[2] We have held that a pretrial motion to suppress is not the proper way to challenge an unlawful detention when lawful detention is an element that the State is required to prove. *Woods v. State*, 153 S.W.3d 413, 415 (Tex. Crim. App. 2005).

[3] We have also held that the Texas exclusionary rule is not appropriate in the context of evading arrest, because evidence of evading does not exist before the attempted arrest. An Article 38.23 instruction is appropriate to exclude illegally obtained evidence of a *prior* crime. *Day v. State*, 614 S.W.3d 121, 128–29 (Tex. Crim. App. 2020).

[4] *Allen v. United States*, 164 U.S. 492 (1896).

### b. Appeal

On appeal, the court of appeals affirmed.[5] Appellant argued that the evidence was insufficient to support his conviction because the State failed to prove beyond a reasonable doubt that the detention was lawful.[6] Relying on *Derichsweiler v. State*,[7] the court of appeals found that Officer Garcia's testimony was sufficient for a rational juror to "have found that the detention was lawful beyond a reasonable doubt."[8] Specifically, the court of appeals concluded that although Appellant was not driving a Chevrolet Silverado, Officer Garcia's testimony established that Appellant was driving a pickup truck; that Appellant's truck was the only vehicle in the rural area described by the 9-1-1 caller; and that there had been "a lot of incidences of human trafficking" in the area at that time.[9] The court of appeals also pointed to evidence showing that Appellant fled from Officer Garcia's show of authority—both by vehicle and then on foot prior to the physical struggle—from

---

[5] *Hernandez v. State*, No. 13-24-00036-CR, 2025 WL 555779, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 20, 2025).

[6] *Id.* at *1.

[7] 348 S.W.3d 906 (Tex. Crim. App. 2011) (finding reasonable suspicion existed where the appellant's conduct was "not overtly criminal in any way" but was "bizarre to say the least").

[8] *Hernandez*, 2025 WL 555779, at *4.

[9] *Id.* at *3.

which a juror could infer that Appellant was involved in criminal activity.[10] "[B]ased on the evidence and reasonable inferences from that evidence," the court of appeals concluded that the evidence was sufficient for a rational juror to find, beyond a reasonable doubt, that the initial detention was lawful.[11] We granted Appellant's petition for discretionary review.[12]

## II. Applicable Law

### a. Sufficiency of the Evidence

Evidence is legally sufficient to support a conviction if, when viewing all of the evidence in the light most favorable to the verdict, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When conducting a sufficiency review, we consider all the evidence admitted at trial. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We do not sit as the thirteenth juror, and we do not substitute our judgment for that of the factfinder by

---

[10] *Id.* at *4.

[11] *Id.*

[12] Appellant's ground for review states: "Whether the 13th Court of Appeals's [sic] mischaracterization of evidence resulted in an erroneous decision which has 'so far departed from the accepted and usual course of judicial proceedings . . . as to call for an exercise of the Court of Criminal Appeals' power of supervision.'"

reevaluating the weight and credibility of the evidence. *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023).

The jury is permitted to draw reasonable inferences from the evidence adduced at trial. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Additionally, the jury may use common sense, common knowledge, personal experience, and observations from life when drawing inferences. *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

The sufficiency of the evidence is measured against the hypothetically correct jury charge, defined by the statutory elements as modified by the charging instrument. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that accurately states the law, is authorized by the indictment, does not increase the State's burden of proof, and adequately describes the offense with which the defendant is charged. *Id.*

An individual evades arrest "if he intentionally flees from a person he knows is a peace officer . . . attempting lawfully to arrest or detain him." TEX. PENAL CODE § 38.04(a). "The text of the statute is plain: it requires proof that an attempted arrest or detention is lawful at the time the person flees." *Day v. State*, 614 S.W.3d 121, 127 (Tex. Crim. App. 2020). "[W]hen a lawful detention is an element of the crime, a

failure of the State to prove beyond a reasonable doubt that the detention was lawful must result in an acquittal of the defendant." *Id.* at 125.

### b. Investigative Detention

We review *de novo* whether the totality of circumstances is sufficient to support an officer's reasonable suspicion of criminal activity. *Crain v. State*, 315 S.W.3d 43, 48–49 (Tex. Crim. App. 2010). An investigative detention is a seizure under the Fourth Amendment and is unreasonable unless "supported by reasonable suspicion to believe that 'criminal activity' may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v. Ohio*, 362 U.S. 1, 30 (1968)); *State v. Castleberry*, 332 S.W.3d 460, 466–67 (Tex. Crim. App. 2011). Reasonable suspicion exists when law enforcement has "specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013).

When determining whether an officer had reasonable suspicion for a detention, we look to the totality of the circumstances and "whether there was an objectively justifiable basis for the detention." *Derichsweiler*, 348 S.W.3d at 914. In assessing whether he has reasonable suspicion for a detention, an officer may "draw on [his] own experience and specialized training to make inferences from and

deductions about the cumulative information available to [him] that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). The information known to the officer at the time of the warrantless detention must support more than a mere hunch. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017).

### c. The proper standard of review

In sum, the proper standard of review for whether the evidence was sufficient to enable a rational juror to find that Officer Garcia's traffic stop was supported by reasonable suspicion is the same as the one we set forth in *Long v. State*:

> In the context of this case, if we are to make a legal determination of [the reasonableness of a detention], we have to rely upon the jury's verdict. For determinations of historical fact, we apply the traditional standard of review for legal sufficiency to determine what the totality of the circumstances are, deferring to the jury's rational factual determinations and inferences. Then, we evaluate *de novo* the purely legal question of whether [the detention was reasonable].

535 S.W.3d 511, 519 (Tex. Crim. App. 2017) (internal citations omitted).[13]

---

[13] Contrary to PRESIDING JUDGE SCHENCK's contention, the question of the proper standard of review *is* a "simple" one. *Post* at 13 n.12 (SCHENCK, P.J., dissenting). In *Guzman*, we held that a reviewing court "should afford almost total deference to a trial court's determination *of the historical facts that the record supports*," but we review *de novo* the application of the law to fact questions. 955 S.W.2d at 89 (emphasis added). When an element of an offense requires a legal determination, we apply the standard set out in *Long* that requires deference to the historical facts implicitly found by the jury, but no deference to their legal determinations. 535 S.W.3d at 519.

JUDGE YEARY posits that "[i]t is also arguable that the majority is mistaken to rely on *Long* . . . as authority for the proposition that our review of the jury's reasonable suspicion determination

## III. Discussion

Appellant first contends that the court of appeals relied on facts that are not supported by the record in reaching its conclusion that a rational juror could find, beyond a reasonable doubt, that the attempted detention was lawful. Disregarding the unsupported evidence, Appellant argues that no rational juror could find, beyond a reasonable doubt, that Officer Garcia's detention was lawful. We first examine the contested evidence and then turn to the ultimate sufficiency question.

### a. Contested Evidence

In reaching its conclusion, the court of appeals relied on the following facts: Officer Garcia was dispatched to a rural area of Willacy County to respond to a 9-1-1 call reporting a suspicious vehicle driving slowly; the 9-1-1 caller described a four-door Chevrolet Silverado driving west; when Officer Garcia arrived at the area, he

---

should be *de novo*." *Post* at 5 (YEARY, J., dissenting). This is so, in JUDGE YEARY's view, because *Long* was a statutory interpretation case—"a pure question of law, subject to our *de novo* review"— but "[h]ere, in contrast, the definition of reasonable suspicion is undisputed." *Id.* JUDGE YEARY misrepresents our holding in *Long*. Certainly, the preliminary question in *Long* was one of statutory construction: "First, we consider whether the Article 18.20 definition of 'oral communication' incorporates the 'legitimate expectation of privacy' standard." 535 S.W.3d at 520. But that was not the end of the analysis in *Long*. Rather, we then turned to the legal determination of "whether the State actually proved that Coach Townsend's speech was 'oral communication,'" in other words, "whether Coach Townsend harbored a subjective expectation of privacy that society is prepared to regard as objectively reasonable." *Id.* That, we said, was subject to *de novo* review. *Id.* at 519. The same is true here: the legal determination of whether Officer Garcia had reasonable suspicion to effectuate a traffic stop *is* "subject to our *de novo* review." *Contra post* at 5 (YEARY, J., dissenting).

observed a vehicle "close to the mailbox belonging to the address given by the [9-1-1] caller"; there were no other vehicles in the area; when Officer Garcia activated his emergency lights, Appellant "did not stop his vehicle and continued to drive away from Officer Garcia, turning north on a dirt road"; and Appellant ultimately arrived at a gate and stopped his vehicle.[14] Appellant asserts that the court of appeals' statements (1) that Officer Garcia observed a vehicle "close to the mailbox belonging to the address given by the [9-1-1] caller"; and (2) that Appellant "did not stop his vehicle and continued to drive away from Officer Garcia, turning north on a dirt road" are not supported by the record.

i.      *Proximity to the Mailbox*

Officer Garcia testified that the vehicle was "in close proximity to the residence" and "in the vicinity that the caller had advised." But this testimony is not supported by the evidence in the record. The photographic evidence in the record shows that the dirt road that Appellant was driving on was south of "several residences," and the residence and mailbox belonging to the 9-1-1 caller was the northernmost.[15] As explained by Officer Garcia, State's Exhibit 7 depicts a sign

---

[14] *Hernandez*, 2025 WL 555779, at *4–5.

[15] *See infra* at Appendix A. Appendix A is State's Exhibit 1 admitted at Appellant's trial. The 9-1-1 caller described a suspicious vehicle driving at a slow speed in a rural area of Willacy County, specifically near the area of FM 1420 and FM 498. FM 1420 is a road that runs north-south and is located at the bottom of Appendix A. The dirt road where Officer Garcia turned on his lights runs

behind which he saw Appellant's taillights as well as two other residences between the 9-1-1 caller's and the dirt road. Furthermore, there was no testimony that Appellant's truck was observed at any time by Garcia to be close to the caller's house or mailbox. Considering all of this evidence, the record does not support the court of appeals' statement that Appellant's truck was "close to the mailbox belonging to the address given by the [9-1-1] caller."

## ii. Driving Away

Officer Garcia testified that when he arrived at the scene, he observed Appellant's vehicle already on the dirt road. Officer Garcia followed Appellant and activated his emergency lights after he "had already turned onto that road." The court of appeals noted that flight from an officer before the officer has attempted an arrest or detention can be the "key ingredient justifying the decision of a law enforcement officer to take action."[16] But the record here belies the applicability of this scenario to the instant case: Appellant's vehicle was already driving down the dirt road, as Officer Garcia testified, and there was no evidence to suggest he

---

east-west and is located down the middle of Appendix A. As Officer Garcia testified, Appellant's vehicle was "already on the dirt road" when the traffic stop was initiated. *See* 3 RR 23. That testimony belies the court of appeals' assertion that the vehicle was "in close proximity to the residence" of the 9-1-1 caller or "close to the mailbox belonging to the address given by the [9-1-1] caller."

[16] *Hernandez*, 2025 WL 555779, at *8–9 (citing *Washington v. State*, 660 S.W.2d 533, 535 (Tex. Crim. App. 1983) (determining whether probable cause to search or arrest existed)).

intentionally fled the police vehicle before Officer Garcia activated his emergency lights. Given that these facts are not supported by the record, we do not consider them in our analysis.

### b. Analysis

The sum total of the evidence known to Officer Garcia at the time of Appellant's detention was as follows: (1) a woman had called 9-1-1 thirty minutes prior to Officer Garcia's arrival and reported a "suspicious" Chevrolet Silverado; (2) there were several residences in the area, but no other cars driving at that time; (3) the area had experienced incidences of human trafficking; and (4) Appellant was already driving down the dirt road when Officer Garcia arrived, but not near the area where the 9-1-1 caller described.

As Officer Garcia himself testified, driving a truck driving slowly on a dirt road at night is not on its own suggestive of criminal activity. Furthermore, Officer Garcia testified that he did not witness Appellant violate any law. And Appellant's conduct was not "bizarre" so as to suggest "someone who was looking to criminally exploit some vulnerability." *Derichsweiler*, 348 S.W.3d at 917. In fact, Officer Garcia testified on cross-examination that there were residences as well as ranch land down the dirt road where the traffic stop was initiated, and that it would not be uncommon for

people to go out to that area.[17] Furthermore, Officer Garcia also testified that the road was not the smoothest of roads and that it would not be uncommon for someone to drive slower on an unpaved road like the one Appellant's vehicle was on.

Officer Garcia needed to establish "specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Wade*, 422 S.W.3d at 668. As Officer Garcia admitted at trial, he arrived on scene thirty minutes after the 9-1-1 call which would have been "a lot of time for a vehicle to move in and out of the area." Furthermore, Appellant's vehicle did not

---

[17] JUDGE PARKER also emphasizes Officer Garcia's testimony that he did not see another vehicle for maybe miles in the thirty minutes on the way to the caller's residence. *Post* at 6–7 (PARKER, J., dissenting). PRESIDING JUDGE SCHENCK appears to also emphasize this point. *Post* at 3 (SCHENCK, P.J., dissenting) ("He spotted no other vehicles on the road."); *see also id.* at 12 (". . . . when Deputy Garcia arrived *thirty minutes later*, the same or a similar vehicle appeared to remain lurking in that same vicinity. . . .") (original emphasis). Speculation, unlike a reasonable inference, is not sufficiently based on the evidence to support a finding beyond a reasonable doubt. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). A rational jury could not reasonably infer that Appellant's vehicle was the same vehicle described by the 9-1-1 caller because the absence of vehicles on Officer Garcia's drive to the location of the 9-1-1 call does not provide specific, articulable facts about Appellant's particular vehicle. Moreover, Officer Garcia admitted at trial that thirty minutes was sufficient time for the vehicle in question to have left the scene. PRESIDING JUDGE SCHENCK also asserts that the "fact that the vehicle appeared to remain thirty minutes hardly detracts [from the reasonable suspicion analysis]—if anything, it adds to the suspicion that prompted the call." *Post* at 7 (SCHENCK, P.J., dissenting). But this assertion lacks any foundation in the record. There is simply no record evidence that the vehicle that Officer Garcia saw "appeared to remain thirty minutes" at the scene of the 9-1-1 call.

match the specific description provided to Officer Garcia by the 9-1-1 caller. In sum, there was nothing to link Appellant's vehicle to any criminal activity.[18]

A seminal case on point is *Derichsweiler*, which we called "admittedly a close call" on the issue of reasonable suspicion. 348 S.W.3d at 917. There, a 9-1-1 caller and his wife reported that a man pulled up next to them in the drive-thru lane at McDonald's "kind of grinning . . . and looking straight at us." *Id.* at 909. The man lingered and then drove off but returned minutes later acting in the same way. *Id.* The couple felt "threatened" and "intimidated" by the man's conduct, so they called 9-1-1. *Id.* As the husband called, the couple observed the man leaving the McDonald's parking lot and driving to the adjacent Wal-Mart, "pulling up beside at least two parked cars . . . and tarrying there." *Id.* at 910. We concluded that the defendant's conduct "was bizarre to say the least," and that "the repetition of

---

[18] JUDGE PARKER posits that "[a]nother explanation could be a possible trespass." *Post* at 11 (Parker, J., dissenting). JUDGE PARKER asserts that the 9-1-1 caller's description of the vehicle was "behavior that a reasonable officer could reasonably suspect to be the 'casing' of the caller's home." *Id.* at 11. Contrary to JUDGE PARKER's argument, there are no specific, articulable facts to suggest that the 9-1-1 caller believed the "suspicious" Chevrolet Silverado was "casing" her home. Second, Officer Garcia never testified that he considered this theory. Nor did either of the parties or the court of appeals consider this theory. And third, as Officer Garcia testified, the dirt roads in this area lead to "ranchland and rural land" where people "go out there . . . for work" and "live." This case may have been different if, for example, there was evidence of multiple passes by the 9-1-1 caller's home. *See infra* at 15 (citing *Derichsweiler*, 348 S.W.3d at 917). But without "specific, articulable facts," there is no support for JUDGE PARKER's assertion that the vehicle that Officer Garcia pulled over was about to or had been trespassing anywhere. *See Wade*, 422 S.W.3d at 668.

similar, apparently scrutinizing, behavior directed at parked cars in the adjacent Wal–Mart parking lot reasonably suggests a potential criminal motive." *Id.* at 917. This was so because the conduct "reasonably suggests someone who was looking to criminally exploit some vulnerability—a weak or isolated individual to rob or an unattended auto to burgle." *Id.*

We found the evidence in other cases to be weaker than the "close call" in *Derichsweiler*. *Id.* at 917. For example, in *Arguellez v. State*, 409 S.W.3d 657 (Tex. Crim. App. 2013), "a male subject in a tan Ford Taurus" was observed by a 9-1-1 caller "taking photos at the city pool . . . parked beside the fence." *Id.* at 659 (cleaned up). Officers responded and saw a vehicle fitting that description "pulling away from the side of the pool." *Id.* at 659–60. The 9-1-1 caller even confirmed that the patrol car was behind the correct vehicle. *Id.* at 660. On appeal, the defendant challenged whether there was reasonable suspicion to justify his stop and investigative detention. *Id.* at 661. We concluded:

> The totality of circumstances, including the cumulative information known to the cooperating officers at the time of the stop, was that an unknown male in a described vehicle was taking photographs at a public pool. Photographs are routinely taken of people in public places, including at public beaches, where bathing suits are also commonly worn, and at concerts, festivals, and sporting events. Taking photographs of people at such public venues is not unusual, suspicious, or criminal.

> The generally matching description of the vehicle simply connects appellant to the "suspicious" photography, but does not in any way suggest that, by taking pictures in a public place, appellant was, had been, or soon would be, engaged in criminal activity. And since there was no indication of crime being afoot, leaving the scene of such photography does not constitute flight or evasion. Likewise, the fact that the pool manager remained in contact with the dispatcher and confirmed that the initial officer was behind the suspect vehicle does not in any way indicate that crime was afoot.

*Id.* at 664.

Likewise, in *Martinez v. State*, 348 S.W.3d 919 (Tex. Crim. App. 2011), "the police dispatcher radioed that an anonymous caller reported that a male driving a blue Ford pickup truck stopped at [an intersection], put two bicycles into the back of the truck, and drove away westbound." *Id.* at 922. The officer, who was on patrol in the general area, "spotted a green Ford F-250 truck that 'looked like it was blue' approximately three quarters of a mile away from the site of the reported incident." *Id.* The officer trailed the truck for four blocks without observing any traffic violations, then stopped the vehicle. *Id.* After stopping the vehicle, the officer observed evidence of driving while intoxicated. *See id.* While we noted that the activity described was "unusual," we concluded that "[m]ore than the officer's opinion that an activity is 'suspicious' was needed to relate the activity to a criminal act." *Id.* at 925. To reach this conclusion, we emphasized that "there was neither a complainant nor a report of stolen bicycles. The anonymous caller did not report

contextual factors that reasonably connected the unusual activity to a theft." *Id.* We further emphasized had that the officer had "very little information, corroborated or otherwise," to connect the defendant to unusual activity "other than the fact that [the defendant] was driving a Ford pickup truck, similar in color to the described truck, close to the time that the unusual activity occurred, and within three quarters of a mile west of the reported incident." *Id.* We distinguished *Derichsweiler* and held that the officer in *Martinez* "had significantly less, and less reliable, information: a minimal, somewhat inaccurate description of the suspect vehicle, an anonymous caller, a larger search area, and no suspicious behavior observed by the officer." *Id.* at 926.

In sum, the evidence in both *Arguellez* and *Martinez* fell short of the "admittedly . . . close call" that was *Derichsweiler*. 348 S.W.3d at 926. The evidence in this case falls even shorter.[19] Like in *Arguellez*, there was nothing "unusual,

---

[19] PRESIDING JUDGE SCHENCK analogizes this case to the decision of the Supreme Court of the United States in *United States v. Cortez*, 449 U.S. 411 (1981). *Post* at 9 n.6 (SCHENCK, P.J., dissenting). But PRESIDING JUDGE SCHENCK's recitation of *Cortez* ignores important facts that were key to the Supreme Court's analysis. To start, the border patrol agents had found sets of human footprints, from 8 to 20 persons, walking in a well-defined path, in the desert, which ended at "an isolated point on Highway 86." *Cortez*, 449 U.S. at 413. The footprints would follow Highway 86 until approximately highway milepost 122, where the tracks disappeared "at the road." *Id.* This behavior, to the officers, amounted to a "particular pattern of operations." *Id.* at 419. The officers also knew that the smuggling only occurred on clear weeknights, *id.*, and the night in question was the only such night on the week in question, *see id.* The officers staked out a location approximately forty-five minutes from milepost 122 and tracked vehicles that passed them in one direction and, an hour-and-a-half later, returned in the opposite direction. *Id.* at 419–20. And,

suspicious, or criminal" about an individual driving slowly on a dirt road at night. *See* 409 S.W.3d at 664. Nor was there any evidence that "[A]ppellant was, had been, or soon would be, engaged in criminal activity." *See id.*[20] And like in *Martinez*, the same "significantly less, and less reliable, information" is evidenced here. *See* 348 S.W.3d at 926. Prior to initiating the traffic stop, Officer Garcia made no attempt to verify whether the vehicle in question matched the description of the vehicle described by the 9-1-1 caller. In fact, as Officer Garcia testified, he saw a vehicle's taillights and initiated a traffic stop. Even if we were to credit Officer Garcia's conclusion that Appellant's vehicle was driving suspiciously, "[m]ore than the officer's opinion that an activity is 'suspicious' was needed to relate the activity to a criminal act." *See id.* at 925. That evidence is lacking from the record.

To the extent that the State relies on Officer Garcia's personal knowledge that this particular area was known for human trafficking, that argument is not persuasive. If that were sufficient, any vehicle driving slowly in an area with known

---

based on the number of footprints, only certain vehicles capable of transporting a large number of illegal immigrants could qualify. *Id.* at 420. It is no wonder than the Supreme Court concluded that reasonable suspicion was met in *Cortez. See id.* at 421. Put simply, the law enforcement officers in *Cortez* had a great deal more information about the car in question at their disposal than Officer Garcia had about Appellant's vehicle in this case.

[20] The facts of this case are likely weaker than those in *Arguellez*: (1) Officer Garcia did not stop the same vehicle that was *specifically described* in the 9-1-1 call; and (2) Officer Garcia arrived *thirty minutes* after the 9-1-1 call, rather than while the 9-1-1 caller was still on the phone with dispatch.

activity of human trafficking could be detained on suspicion that that vehicle was engaged in human trafficking. There were no "specific articulable facts" that Officer Garcia could rely upon to distinguish the ordinary driver on the dirt road from the one possibly engaged in human trafficking. *See Wade*, 422 S.W.3d at 668. And the 9-1-1 call does not move the needle: all it describes is a "suspicious" vehicle but provides no indication that human trafficking was at play. Worse for this theory, the 9-1-1 caller identifies a vehicle that ultimately was not the vehicle that Officer Garcia stopped. Put plainly, the facts necessary to support reasonable suspicion are not in the record.

Examining the record as a whole, we conclude that the evidence is insufficient to sustain Appellant's conviction for evading arrest. The record is devoid of evidence upon which Officer Garcia could have reasonably concluded that Appellant was, had been, or soon would be engaged in criminal activity.[21]

---

[21] PRESIDING JUDGE SCHENCK also argues that Appellant's detention might have been justified under the community caretaking function. *Post* at 14 (SCHENCK, P.J., dissenting) (citing *Wright v. State*, 7 S.W.3d 148 (Tex. Crim. App. 1999)). This is so because "[s]low speeds might also signal distress." *Id.* at 16. But this recrafts the entire State's case from whole cloth. We have previously held that "a police officer may not properly invoke his community caretaking function if he is primarily motivated by a non-community caretaking purpose." *Corbin v. State*, 85 S.W.3d 272, 277 (Tex. Crim. App. 2002) (citing *Wright v. State*, 7 S.W.3d 148, 151 (1999)). In his testimony at Appellant's trial, Officer Garcia expressly disclaimed community caretaking as a basis for the traffic stop and the State never argued community caretaking either at trial to the jury or to the court of appeals below. Consequently, community caretaking is not a valid basis for the traffic stop in light of the evidence admitted at Appellant's trial.

**IV.    Conclusion**

We conclude that no rational juror could find beyond a reasonable doubt that Officer Garcia's attempted detention of Appellant was supported by reasonable suspicion. Because the evidence is insufficient to sustain the lawful-arrest element of Appellant's conviction, we reverse the judgment of the court of appeals and render a judgment of acquittal.

**Delivered: December 19, 2025**
**Publish**

**Appendix A**

