

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0176-25

**ISRAEL GARCIA HERNANDEZ, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE THIRTEENTH COURT OF APPEALS WILLACY COUNTY

SCHENCK, P.J. filed a dissenting opinion.

### DISSENTING OPINION

The majority concludes no rational juror could find beyond a reasonable doubt the initial traffic stop of Appellant, Israel Garcia Hernandez, could be reasonable as a matter of fact within the meaning and sweep of the Fourth Amendment. I disagree. I would instead conclude we are obliged to give deference to a rational jury's factual

findings[1] and to uphold the trial court's judgment by implementing that verdict on any basis supported by the record. I believe that the evidence is more than sufficient to show that Deputy Garcia had reasonable suspicion for the initial traffic stop. Alternatively, I conclude a jury might have reasonably found the community caretaking doctrine applicable to the initial stop. Either conclusion would compel affirmance here.

## BACKGROUND

In this case, a resident 911 caller described what she believed to be a Chevrolet Silverado driving slowly through Willacy County, a sparsely populated area of South Texas not far from the Texas-Mexico border. I take judicial notice that Willacy County covers almost 600 square miles and held a population of approximately 20,000 residents during the time the facts of this case played out. [2]

---

[1] *See McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim App. 2023) (explaining misapplication of the standard of review involves reweighing evidence, rationalizing it by a hypothesized weaker case than the record presents, and overlooking dispositive distinctions in the case). While the majority cites to *Long v. State*, 535 S.W.3d 511, 519 (Tex. Crim. App. 2017) urging that our review of the legal decision is *de novo*, there is no dispute here over the law as governs generally. Rather, as *Long* makes clear, we are, instead, obliged to defer to all rational determinations that jurors may have made in support of the verdict. Our review of the trial judge's decision to turn aside the request for directed verdict would then track the same pattern as a sufficiency question. *See Williams v. State,* 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)) ("We treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence.").

[2] Census Bureau statistic compiled by USAFacts. *See Our Changing Population: Willacy County, Texas*, USAFacts, https://usafacts.org/data/topics/people-society/population-and-

Half an hour later, Deputy Garcia arrived where the caller reported the vehicle.  At trial, the prosecutor's closing argument noted that on evenings such as the date of the call, "there's only four units on patrol on any given night on a good night, sometimes only two."  *See* 3 RR 113.  Upon arrival to the general location described by the caller, Deputy Garcia spotted Hernandez behind the wheel of a slow-moving truck sporting similar characteristics to the truck the caller described.[3] He spotted no other vehicles on the road.

At this point in the fact pattern, I agree with Judge Parker that Deputy Garcia could have reasonably believed Hernandez was driving the same truck the caller described, as he testified at trial.  Regardless, the fact that the jurors credited his testimony would be adequate and reasonable to support the trial's outcome, as jurors are entitled to rely on common knowledge of the proliferation of mid-size pickup trucks and the similarity among them.  *Garcia v. State,* 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

---

demographics/our-changing-population/state/texas/county/willacy-county/ [https://perma.cc/D6C4-L2R6] (last visited Nov. 20, 2025); s*ee also Emerson v. State*, 880 S.W.2d 759, 765 (Tex. Crim. App. 1994) ("[T]aking of judicial notice of a fact outside the record is part of the inherent power and function of every court, whether a trial or appellate tribunal."), quoting G. Currie, *Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation,* 1960 WIS. L. REV. 39.; *Bell v. State*, 63 S.W.3d 529, 531 (Tex. App.—Texarkana 2001, pet. ref'd) (taking judicial notice that it is 80.9 miles from Dallas to Sulphur Springs).

[3] When asked at trial to recall the make and model of the truck detained, Deputy Garcia equivocated, initially saying it was not a Silverado and later saying he couldn't recall.  3 RR 62.

In all events, given the truck's slow movement and isolated presence on a road in close proximity to the 911 call's report of a potentially suspicious pick-up truck, Deputy Garcia reasonably surmised—or a fact finder could readily so find—Hernandez's truck may have either (1) been engaged in criminal activity, including but not limited to, human smuggling common to the area, or (2) was experiencing a medical or other emergency resulting in its apparent slow motion.

After spotting Hernandez's vehicle, Deputy Garcia turned down the same road as Hernandez and activated the emergency lights. Hernandez drove on for what his brief tells us is a period of four minutes, paying no mind to the emergency lights. When Hernandez finally stopped at what later proved to be his brother's property, Deputy Garcia attempted to detain him. Hernandez refused to comply. When Hernandez's defiant behavior escalated into a physical altercation, Deputy Garcia then arrested Hernandez.

## DISCUSSION

The majority ignores the escalation leading to the actual arrest, focusing instead on Deputy Garcia's initial decision to signal Hernandez to stop. While I agree the stop requires legal justification, Deputy Garcia did not originally seek to arrest Hernandez when he arrived and illuminated his lights, only to inquire into the apparent connection between Hernandez and the 911 call. Probable cause is not

necessary for an officer to reasonably seek to inquire of whether criminal activity was afoot or whether a vehicle's slow movement signaled a need for medical or mechanical assistance. Deputy Garcia testified at trial the 911 caller only expressed concern over the lingering vehicle; he did not elaborate on whether the concern involved fears of something criminal or care for whether the vehicle's driver encountered a medical or mechanical problem. *See* 3 RR 55.

For purposes of a *Terry* stop when crime may be afoot, only a reasonable suspicion—amounting to a "'less demanding' standard" than the probable cause standard required for other types of police action—is required. *See Terry v. Ohio*, 392 U.S. 1 (1968); *see also Kansas v. Glover*, 589 U.S. 376, 380 (2020); *Alabama* v. *White*, 496 U.S. 325, 330 (1990). The existence of reasonable suspicion also ultimately depends "upon both the content of information possessed by police and its degree of reliability." *Id.* at 330.

Though *Terry* also explains "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," we employ a "totality of the circumstances" analysis in deciding whether the facts of an individual case before the Court amount to "an objectively justifiable basis for the stop." *Terry*, 392 U.S. at 21; *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim.

App. 2011); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("Terms like 'articulable reasons' . . . are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture— must be taken into account."). This test involves pointing to "specific, articulable facts . . . combined with rational inferences from those facts, [which] would lead [law enforcement] to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013).

Neither controlling statutes nor case law include the requirement an officer specify (or know the name of) the particular Penal Code section(s) he suspects an individual to have violated—only that the facts give rise to suspicion of some "criminal activity." *See Derichsweiler*, 348 S.W.3d at 916. In *Terry*, for example, Officer McFadden observed two men repeatedly walking past stores in Cleveland and conversing with each other. *Terry*, 392 U.S. at 6. He later testified their unusual movement over ten to twelve minutes drew his suspicion, and while he was "unable to say precisely what first draw his eye to them," as he put it, "'I get more purpose to watch them when I seen their movements.'" *Id*. at 5-6. He did not know whether the men were "casing" the store for a subsequent burglary (a property crime) or a

"stick up," i.e., a robbery; still, he "considered it his duty as a police officer to investigate further." *Id.* at 6. The Warren court overwhelmingly (8-1) agreed and supported his decision not only to stop his suspect, as Deputy Garcia attempted here by turning on his lights, but to put hands on him for purposes of searching for a weapon.

The totality of the circumstances analysis does not emphasize the existence of any specific fact or fact category; instead, it considers the impact of all things known to and playing out before the officer, including his knowledge of the area and the cause for his presence there. *See United States v. Sokolow*, 490 U.S. 1, 7–8 (1989). The fact that a neighbor in this sparsely populated area called to report suspicious lingering is significant in the case before us. The fact that the vehicle appeared to remain thirty minutes hardly detracts from that picture—if anything, it adds to the suspicion that prompted the call.

To the extent the law might require Deputy Garcia point to the specific articulable facts contributing to the reasonable suspicion required to pull Hernandez over, I would assert these facts, combined with his knowledge of smuggling in the area as per his trial testimony, suffice to initiate a brief stop.[4] *See* 3 RR 31.

---

[4] *See United States v Brignoni-Ponce*, 422 U.S. 873, 884-885 (1975) ("Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider the characteristics of the area in which they encounter a vehicle.

But whether, in the case at bar, Deputy Garcia suspected smuggling of people or drugs, what type of drugs might be suspected, and whether he was observing a "meet" or slowly studying the field next to an unusually slow-moving vehicle to uncover a "drop," is not controlling. What matters to the case before us is that even without the underlying knowledge of smuggling contributing to his suspicion, a totality of the circumstances test is at play here, and particularly after what appeared to be more than thirty minutes of loitering on an isolated stretch of rural road arousing suspicion of local inhabitants, *any* reasonable officer would have shared Deputy Garcia's concern that some form of criminality might be afoot. Given Deputy Garcia's testimony regarding the presence of one sole vehicle on the road upon his arrival (which took approximately thirty minutes), a reasonable factfinder could have concluded these facts formulated the reasonable suspicion necessary to initiate a stop. *See* 3 RR 29-31.[5] *Long* compels the Court to defer to all such factual determinations. *Long*, 535 S.W.3d at 519.

---

Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant.").

[5] At trial, the State questioned Deputy Garcia about what he observed upon arrival. When asked why, when he did not know for certain whether the truck on the scene was the exact truck the caller described, he still sought to initiate a stop, Deputy Garcia replied, "Because it was in the vicinity that the caller had advised our dispatch. And the caller had advised – had described it as a pickup truck. And that area, it's a rural area. There's no other vehicles out there. So when I saw that vehicle there, you know, *I figured that was the vehicle*." 3 RR 29. When asked whether the fact the vehicle Deputy Garcia observed was not a Chevy Silverado affected his analysis of the

Additionally, an officer's reasonable suspicion is not negated in the case the activity giving rise to concern later turns out to be innocent. [6] *See Navarette v. California*, 572 U.S. 393, 403 (2014); *see also United States v. Arvizu*, 534 U.S. 266, 277 (2002) (a reasonable suspicion "need not rule out the possibility of innocent conduct"). Rather, the inquiry reflects the reality that, in addition to an officer's present observations, his knowledge of circumstance surrounding the events facing him and his past experiences in the field also matter. *Arvizu*, 534 U.S. at 273 (2002); *see also Cortez*, 449 U.S. at 418 (1981) (permitting officers to draw from "objective observations, information from police reports…and consideration of the modes or patterns of operation of certain kinds of lawbreakers.").

The Supreme Court's decisions in *Terry* and its progeny tell us not to parse those officers' judgments with tweezers and microscopes so long as the stop lasts no longer than is reasonably necessary to ascertain whether the cause for reasonable

---

situation, the deputy replied, "No, because it was – the caller described a pickup truck. When I arrived to the area, I observed a pickup truck . . . ". 3 RR 30. When the State again asked Deputy Garcia why he sought to initiate a stop, he replied "Because we had gotten a report of a suspicious vehicle in that area. That was the only vehicle out there in the dirt road." *Id.*

[6] Not unlike the case at hand, the United States Supreme Court has found reasonable suspicion present where Border Patrol agents who had uncovered evidence of human smuggling into the United States from Mexico encountered a vehicle driving past them with no outright obvious indication of illegal activity aboard, but with the capacity to transport groups of people. When the vehicle again drove by minutes later, the agents conducted a stop, later held to be reasonable, and discovered smuggled individuals inside. *See United States v. Cortez*, 449 U.S. 411 (1981).

suspicion is ill-founded.[7]  Therefore, in my view, the only question in the case before us is whether the jury (or trial court decision to embrace the jury's wisdom) could have found the facts sufficient to give rise to reasonable suspicion.  I frankly do not see that as a difficult question, once the facts are accounted for in light of the record and our obligation to yield to the reasonable inferences it supports at the moment Deputy Garcia made the decision to initiate what should have been a brief stop.

While the majority opinion properly includes *Arvizu* among its Fourth Amendment jurisprudence on detention—including to explain how, in developing reasonable suspicion, officers may utilize their "own experience and specialized training to make inferences from and deductions about the cumulative information available"[8]—it abruptly veers from the basis of the holding towards a focus on the extent and specifics of a situation contributing to the totality of the circumstances.[9]  Whether it is jurors or courts called upon to second-guess officers' observations, their review must account for the officers' judgment in the moment.  *Arvizu,* 534

---

[7] Similarly, as discussed in more detail below, the law permits an officer to stop a motorist to determine if there is need for assistance.

[8] *Arvizu*, 534 U.S. at 273.

[9] *See* Maj. Op. at 15-19.  The majority treats the earlier case of *United States v. Cortez*, 449 U.S. 411 (1981) similarly, forgetting the *Cortez* Court formally adopted the totality of the circumstances test, and not a "specific circumstances" test.

U.S. at 273; *Westerman v. State*, No. PD-1314-05, 2006 WL 2694388, at *4 (Tex. Crim. App. Sept. 20, 2006) (Yeary, J., dissenting) (not designated for publication) (explaining appellate courts are not authorized to engage in "Monday morning quarterbacking"). Instead, it is important in this context and others that we assume a more modest posture accepting that "we are, at best, systemically secondary in an already slow and expensive process (and have a grossly unfair advantage of time over the trial courts) . . . [and that] we cannot function like an instant replay booth." *McPherson v. Rudman,* No. 05-16-00719-CV, 2018 WL 3062447, at *8 (Tex. App.— Dallas June 21, 2018, no pet.) (mem. op., not designated for publication); *see also Jaganathan v. State*, 479 S.W.3d 244, 248 (Tex. Crim. App. 2015) (explaining "there is a difference between what an officer sees during an ongoing event and what we see when reviewing a video," and applying this consideration to a fact pattern involving an officer's decision to pull a driver over.).

To adopt a rule requiring specific behavior or permitting only certain factors for consideration in the totality analysis essentially seeks to reanimate the corpse of the Ninth Circuit's ruling the Supreme Court disavowed in *Arvizu*, disarming police officers of their basic authority and providing criminals a recipe for evading detection. *See* Jennifer Pelic, *United States v. Arvizu: Investigatory Stops and the Fourth Amendment,* 93 J. CRIM. L. & CRIMINOLOGY 1033, 1052 (2002-2003). The

intent of the "totality of the circumstances" test is to consider the individual facts of each case as a whole, not to examine each case before us to ferret out whether it contains specific circumstances adding up to reasonable suspicion.

In this case, a 911 caller familiar with the area requested an officer on site due to something amiss[10] on a rural road in South Texas where human trafficking was common.[11] Just as we are obliged to accept Deputy Garcia's knowledge of the area, he was at least entitled to rely on the 911 caller's familiarity with the neighborhood. Regardless of the 911 caller's knowledge, when Deputy Garcia arrived *thirty minutes later*, the same or a similar vehicle appeared to remain lurking in that same vicinity, driving very slowly as the patrol car approached.

The majority stresses how it took thirty minutes for Deputy Garcia to arrive and encounter Hernandez's truck. This is hardly surprising or helpful to its

---

[10] Judge Finley takes issue with my phrasing here, though I am not sure how his misunderstanding of descriptive language translates to a mischaracterization of facts. "Amiss" means "out of place in given circumstances," according to Webster's third definition of the adjective, and whittles the caller's description down to one word. *See Amiss*, Merriam-Webster, https://www.merriam-webster.com/dictionary/amiss (last visited December 3, 2025). For present purposes it is akin to the observation that a majority opinion is engaged in "jiggery-pokery" or that its treatment of the record is "pure applesauce." *See*, *e.g.*, *King v. Burwell*, 576 U.S. 473, 506, 507 (Scalia, J. dissenting) (employing the phrases).

[11] Such was the case in *Arvizu*, after all, where law enforcement's observation of a minivan on a rural road and its questionable driving decisions combined with knowledge of the road's use in drug trafficking, among other things, added up to reasonable suspicion to stop the vehicle. *See supra*.

conclusion. First, Willacy County covers a wide swath of rural land, lacks a large population, and did not deploy a large number of law enforcement units on any given evening. Second, I strongly disagree with the majority's emphasis on the half hour it took Deputy Garcia to arrive on scene as an indication the reasonable suspicion *was lacking*. Rather, the fact that the same vehicle appeared to remain present in close proximity to the 911 call *increased* suspicion that its operator was possibly engaged in human smuggling or other illegal activity.

Dismissing Deputy Garcia's choice to make the initial traffic stop not only ignores the jury's evaluation of the witnesses, the trial court's judgment and the unanimous court of appeals decision, but it largely begs the question of the proper standard of review.[12]

---

[12] This is not a simple question. The issue was presented to the jury, which answered in the State's favor. Ordinarily, reversal would require more than a simple disagreement. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979)). Here, of course, the issue, though submitted to a jury, is a legal one, or at least a mixed question of fact and law. And even so, we would normally defer to the trial court's ultimate disposition by giving near total deference to it insofar as any factual issue presents itself. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Here, by resolving the issue in accordance with the jury's verdict, the trial court's decision is still, in my view, entitled to at least that level of deference. Our decision in *Long* is not to the contrary, though it does not attempt to untangle the relation between the factual and legal question driving the result. This question is in fact the same as the one that confronted the Supreme Court in *Arvizu* where Justice Scalia questioned how that Court's articulation of the standard requiring "due weight to inferences drawn from [the] facts by resident judges" squared with *de novo* review. *Arvizu*, 534 U.S. at 278 (Scalia, J., concurring). Ultimately, as I, like Justice Scalia in *Arvizu,* find no basis for reversal under *any* standard, I need not explain my rejection of the findings below, whether of the jury or the judges.

The majority's decision also ignores that law enforcement officers, while often first on the line in fighting crime, additionally serve a community caretaking function requiring officers to act within a duty to protect the welfare of an individual or the community. *See Wright v. State*, 7 S.W.3d 148, 153 (Tex. Crim. App. 1999); *see also State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (noting general rule requiring appellate court to affirm on any lawful basis supported by the record). Police officers patrolling remote portions of our State do not travel with lawyers or judges and will often encounter unusual situations or dangerous circumstances requiring they exercise informed judgment about whether to engage at all. An officer may therefore, at times, find it appropriate to pull over a driver without suspicion of criminal activity,[13] if, as here, the driver or a passenger appeared to potentially require medical or mechanical assistance. *See Wright,* 7 S.W.3d at 153.

While the majority stresses how Deputy Garcia testified he was unable to recall by name law enforcement's official "community caretaking function," this Court has not created any rule requiring an officer be aware of terminology or

---

[13] *See Chilman v. State*, 22 S.W.3d 50, 55 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (where a car was stopped at two o'clock in the morning in front of a barricaded entrance to a university); *State v. Ross*, 999 S.W.2d 468, 470 (Tex. App.—Houston [14th Dist.] 1999), aff'd, 32 S.W.3d 853 (Tex. Crim. App. 2000) (where an officer questioned the father of two children were sleeping in a truck parked out front of a bar on a cold evening); *Sweeney v. State*, 6 S.W.3d 670, 671 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (where a driver traveled down a rainy road at 40 miles per hour with a flat tire).

delegation of duties in order to assist someone in need. *See Byram v. State*, 510 S.W.3d 918, 920-921(Tex. Crim. App. 2017); *see also ABA Standards For Criminal Justice* §§ 1-1.1,1-2.2 (1980).[14] Deputy Garcia is not required to be a lawyer or to please judges with awareness of labels of doctrines. He is required to act reasonably in view of his function and in compliance with the constitutional command to the same effect.

In determining a proper stop pursuant to the community caretaking function, this Court considers (1) the nature and level of distress the detained individual expressed, (2) the detained individual's location, (3) whether the individual had access to assistance without the officer, including whether he was completely alone, and (4) to what extent the detained individual would present a danger to others or himself without the officer's involvement. *Id.* at 151-52. We explained in *Corbin v. State*, 85 S.W.3d 272, 277 (Tex. Crim. App. 2002):

> Because the purpose of the community caretaking exception is to allow an officer to "seize" and assist an individual whom he reasonably believes is in need of help, the first factor is entitled to the greatest weight…This is not to say that the weight of the first factor alone will always be dispositive…A particular level of exhibited distress may be seen as more or less serious depending on the presence or absence of the remaining three factors.

---

[14] To prove a stop proper pursuant to the community caretaking function, the Court considers "(1) whether the officer was primarily motivated by a community-caretaking purpose; and (2) whether the officer's belief that the individual needed help was reasonable." *Gonzales v. State,* 369 S.W.3d 851, 854–55 (Tex. Crim. App. 2012). Because the Court is not tasked with making this determination in the case at bar, I will not undertake this analysis here.

*Id.*

A vehicle traveling slowly may, but does not always, signal criminal activity. Slow speeds might also signal distress. For instance, as the Court described in *Corbin*, a police officer might reasonably exercise his community caretaking function upon encountering a driver traveling very slowly because he had two flat tires. *See Corbin*, 85 S.W.3d at 278 (citing *Lebron v. State*, 35 S.W.3d 774, 776-77 (Tex. App.—Texarkana 2001, pet. ref'd)).

In this case, Hernandez was the only vehicle in the vicinity, Hernandez was alone in his pick-up truck, and the truck appeared to be alone on the same isolated stretch of rural road for a period long enough to prompt a 911 call *and* a further thirty minutes to respond. Independent of any possibly criminal situation, the vehicle's continued presence and its slow speed might evidence need of further inquiry to determine whether some form of assistance was required. To be sure, Deputy Garica's effort to inquire was met with evasion that suggested defiance more than a stroke or a broken axle. While that evasion no longer suggested a need for assistance, it dramatically escalated the extant suspicion of criminality attributed to reasonable suspicion for a *Terry* stop as discussed above.

## CONCLUSION

I believe the jury, considering all the evidence and reasonable inferences that could be drawn therefrom, could have rationally found beyond a reasonable doubt that Deputy Garcia had reasonable suspicion to initiate a traffic stop. And, even if not, the jury could have reasonably inferred Deputy Garcia acted appropriately in accordance with the community caretaking function of law enforcement due to the lingering vehicle's slow speeds.[15] Because the majority would not uphold either conclusion, I dissent.

Filed: December 19, 2025

Publish

---

[15] Had this Court hypothetically been asked to undertake a Fourth Amendment analysis on a trial court denial of a motion to suppress involving these same issues, I believe this Court would uphold that denial on the same basis.